**J. COOPER & ASSOCIATES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 00–323C.

United States Court of Federal Claims.

July 12, 2002.

---

Cyrus E. Phillips, IV, Washington, D.C., attorney of record for the plaintiff.

Timothy P. McIlmail, Trial Attorney, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, attorneys of record for the defendant.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

In 1995, the Immigration and Naturalization Service (INS) of the Department of

Justice took steps to increase its workforce pursuant to a mandate from Congress. In particular, the INS sought to recruit an increased number of qualified candidates for Border Patrol and other INS responsibilities. In order to recruit the required level of new personnel within the time frame specified by the Attorney General, the INS began to seek support services for advertising and public relations, with the goal of developing and performing a marketing and advertising plan which would improve both the quality and quantity of the candidates recruited for INS employment.

In a letter dated July 7, 1995, the INS contacted the Small Business Administration (SBA) explaining INS needs for advertising and marketing services and requesting "permission to negotiate an indefinite delivery, indefinite quantity contract directly with J. Cooper and Associates, Inc." (JC & A), pursuant to the Section 8(a) program, Small Business Act of 1953, as amended, 15 U.S.C. § 637 (2000).[1] The plaintiff had received previous approval from the SBA in 1994 to participate in the Section 8(a) Business Development Program. The July 7, 1995 solicitation letter from the INS to the SBA asked that the SBA verify JC & A's Section 8(a) eligibility and provide an SBA contract number for the contract, if approved. The solicitation letter also stated that the INS sought support services estimated in the total amount of $8,000,000.00 over five years and indicated that the base contract term was intended to be twelve months, with four, successive, one-year options, renewable at the discretion of the INS. In addition, the solicitation letter estimated the services sought would be worth $1,600,000.00 annual-

ly, with a minimum guarantee of $250,000.00 in the base year.

Because of the urgency of the INS's needs, a letter contract[2] accompanied the solicitation letter from the INS to the SBA. The enclosed letter contract was signed for the INS by Supervisory Contracting Officer Joseph Garforth, and for JC & A by Joseph Cooper, JC & A's president. The SBA granted the INS's request to use JC & A under the Section 8(a) program, and SBA Contracting Officer Shapleigh Drisko added his signature to the letter contract on July 25, 1995. The use of a Section 8(a) Business Development Letter Contract gave the INS the advantage of permitting an immediate award to a contractor, allowing cost components of various labor categories to be negotiated and definitized later, and the possibility that the contractor could commence performance on INS objectives immediately.

The letter contract stated that an indefinite delivery and indefinite quantity contract (IDIQ contract) was contemplated and indicated that the contract would be definitized in the future by the parties, but not later than October 16, 1995. See 48 C.F.R. § 52.216-25 (1995). The letter contract incorporated the Limitation of Government Liability Clause, stating that the contractor was "not authorized to make expenditures or incur obligations exceeding $250,000.00 dollars," and also providing that "the maximum amount" for which the government would be liable if the contract was terminated would be $250,000.00. See 48 C.F.R. § 52.216-24 (1995). The letter contract further indicated that "if agreement on a definitive contract to supersede this letter contract is not reached by the target date," then the INS contract-

---

1. The original Small Business Act of 1953, Pub.L. No. 53–163, Title II, 67 Stat. 232 (1953), did not contain a "Section 8(a)." However, section 207(c) and section 207(d) empowered the SBA to enter into contracts with government agencies and to subcontract to small business concerns, 67 Stat. at 236. An amendment to the Small Business Act added Section 8(a) and provided, again, that the SBA could enter into contracts with government agencies and subcontract to small business concerns. Pub.L. No. 85–536, § 2 [8(a)(1), (2)], 72 Stat. 384, 389 (1958). In 1978, Section 8(a)(1)(C) was amended to include language, for the first time, which provided that

the SBA could subcontract with "socially and economically disadvantaged small business concerns," Pub.L. No. 95–507, Title II, § 202(a), 92 Stat. 1760, 1761 (1978). "Section 8(a)" is codified at 15 U.S.C. § 637(a)(1)(B) (2000).

2. According to the Federal Acquisition Regulation (FAR), "[a] letter contract is a written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services." 48 C.F.R. § 16.603–1 (1995).

ing officer could "determine a reasonable price or fee" and that, "[i]n any event the Contractor shall proceed with completion of the contract, subject only to the Limitation of Government Liability clause." The SBA delegated to the INS the authority to negotiate definitization of the contract directly with JC & A, rather than through the SBA.

The letter contract also provided that the INS would issue to JC & A written task orders describing specific tasks to be performed. Because of the urgency of the INS's requirements for support services, however, the INS issued oral task orders to JC & A to initiate the project. JC & A sent the INS invoices for the work it had already performed on the contract on August 3, September 11, October 5, and November 13, 1995. On or about August 4, 1995, JC & A submitted a "Time and Material" proposal, for a successor contract with Firm Fixed Price components, in the amount of $7,997,675.60.

On or about August 8, 1995, in response to the invoices submitted to the INS by JC & A and the first of several proposals for a successor contract submitted by JC & A to the INS on August 4, 1995, the INS initiated the first of several requests for assistance from the Defense Contract Audit Agency (DCAA) to review JC & A's accounting system, proposed labor rates and overhead.

On September 30, 1995, the INS modified the letter contract with JC & A by extending the schedule for definitizing the contract to November 13, 1995 and increasing to $500,000.00 both the limitation of government liability and the maximum amount JC & A was allowed to expend or incur in obligations under the contract. The contract modification in pertinent part states: "In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding $500,000.00 dollars [sic]," and also provides that, "[t]he maximum amount for which the Government shall be liable if the contract is terminated is $500,000.00." It appears from the record that on October 20, 1995, the INS paid JC & A $81,053.38 pursuant to JC & A's first invoice, and that the INS paid JC & A a total of $280,926.80, although JC & A's invoices

submitted to the government, through the November 13, 1995 invoice, totaled $331,300.17.

On October 13, 1995, the INS and JC & A discussed the issuance of additional task orders, and on October 20, 1995, JC & A sent a letter to the SBA stating:

When J. Cooper & Associates Inc., (JCA) negotiated and won the INS Advertising contract, it was understood that a series of task orders would be issued/generated. These task orders would follow the scope of work outlined in the contract. To date, JCA has not received any task orders from the INS directly related to the long term campaign outlined in the contract. We have been orally asked to do a series of jobs that we feel are more administrative in nature than the tasks called for in the contract statement of work.

After inquiries from JC & A apparently beginning in October, 1995 and extending through mid-March 1996, the INS indicated that further task orders would be issued, but JC & A received no further task orders from the INS after October 3, 1995. Beginning October 31, 1995, and continuing through May 15, 1996, the INS ordered support services totaling approximately $385,000.00 from contractors other than the plaintiff. During this time, the INS also articulated dissatisfaction with the work JC & A had performed on the contract, as well as with the pricing of that work.

In an e-mail dated October 14, 1995 from Michelle Wall, an INS contract specialist on the JC & A contract, to Joseph Garforth, Supervisory Contracting Officer for the INS, Ms. Wall passed on doubts about JC & A's performance, as follows: "[T]he Personnel group voiced concerns about Cooper's quality issues. i.e.: the article, the ads, photo's, video and strategic plan. They complained of Cooper's lack of creativity in several areas." On November 2, 1995, in a letter from the INS to JC & A, the INS stated:

There is a mutual consensus within the INS structure that the invoice dated September 11, 1995, for the strategic plan (and other work) seems excessive for the product that was delivered. This is not to suggest that the effort put forth to develop

the plan was not legitimate, however, the work product is not reflective of the hours expended. Since we cannot determine the validity of the invoices based on the information you provided as substantiation, a determination was made to have DCAA audit these invoices to verify the hours and amounts claimed.

In addition to auditing the invoices from JC & A, the DCAA audited plaintiff's July 31, 1995, October 1, 1995, and November 6, 1995 proposals for contract definitization. As part of the audit process, in a letter dated December 7, 1995, the DCAA notified JC & A that JC & A's accounting system was considered inadequate in certain respects, including for accumulating, segregating, and reporting costs under government contracts. By letter dated January 22, 1996 from the INS to JC & A, the INS expressed continuing concerns regarding JC & A's invoices and also suggested setting up a meeting to discuss JC & A's prior contract performance problems.

In a letter to the INS dated February 7, 1996, the DCAA indicated that it had discontinued the audit on JC & A's proposals until JC & A supplied adequate cost and pricing data. Later that month, on February 12, 1996, INS officials informed the SBA of JC & A's alleged poor performance on the contract. At a meeting concerning JC & A's performance, attended by officials from the INS, the SBA, and the DCAA, the INS expressed dissatisfaction not only with JC & A's work, but also with JC & A's performance in substantiating the proposed costs. According to notes of the meeting in the record, the INS explained to the SBA that "their preference is to meet their $250,000 threshold of obligation under the letter contract and terminate their involvement with this company [JC & A]." However, in this meeting, also according to the notes of the meeting, Linda Green, the INS Director of Contracts, stated "that in all fairness to the company, she will issue them one more task to give them another chance to perform. She said that she had to urge her customer to issue another task order in light of all the previous problems. . . . [But][t]he company will have to produce superior work at this point in order to turn their current image around."

On March 19, 1996, the INS Program Office requested that JC & A submit proposals to perform task orders, one of which was for black-and-white and full-color advertisements for the Border Patrol. At the time the INS requested the proposals from JC & A, the INS had neither a cost estimate for the task from which to negotiate, nor a funded requisition for the task. On April 4, 1996, JC & A submitted proposals to perform the tasks, including the task requesting black-and-white and full-color advertisements. JC & A's proposed cost for this task was $58,024.76. The INS Program Office informed JC & A that the price was unreasonable, based on an informal estimate of $5,667.00 the INS Program Office had obtained from another contractor. Price negotiations between JC & A and the INS continued for this task until roughly early May, 1996, but the INS Contracting Officer did not award the tasks to JC & A. The INS subsequently obtained an Independent Government Estimate of the cost to perform the task. This estimate estimated the projected cost to be $75,000.00, a figure higher than the $58,024.76 estimate submitted by JC & A and rejected by the INS.

On May 2, 1996, JC & A requested that the INS terminate the letter contract for the convenience of the government, which the INS declined to do. In a letter dated May 16, 1996, the INS informed the SBA that JC & A had "priced prospective INS requirements outside the realm of reasonableness and affordability from this agency's perspective," and that "the program office believes the contractor has not delivered quality products and services, requesting a termination for default." The INS had decided that "pursuing definitization, and/or continuing performance under this contract, in light of these issues, would not be in the best interest of either party." The letter also stated that the contract would be permitted to lapse without additional task orders, and that JC & A should "prepare a proposal for costs incurred in the performance of the contract." The INS informed the SBA that it would obtain support services from other contrac-

tors to meet the INS's ongoing needs. Therefore, the INS and JC & A had operated under the undefinitized letter contract for the entirety of their business relationship.

On June 26, 1996, JC & A submitted a certified Request for Equitable Adjustment under Contract COW–5–C–0017 to the INS contracting officer in the amount of $976,025.04, for "changes, delays, and additional costs incurred ... as a direct result of the government's actions in awarding, managing, and constructively terminating this contract." The DCAA audit report of JC & A's invoices and Request for Equitable Adjustment was issued on September 16, 1996. The report concluded: "Our audit of the $935,724 revised equitable adjustment questions all costs claimed on the basis that the costs are not allocable to the INS contract," and determined that only approximately $265,000.00 of $331.300.17 billed to the INS of JC & A's invoices could be substantiated. The DCAA cited various reasons for its conclusions, including problems with the classification of costs, the allocability of costs to the contract under FAR 31.201–4,[3] and a failure by JC & A to maintain adequate records for recording time charged to the government contract during July through September, 1995. The DCAA audit concluded that the audit was "unable to determine the reasonableness of the costs billed in relation to the product received." On November 18, 1996, a final payment of $49,936.22 was made to JC & A, pursuant to JC & A's invoices, bringing the total the INS had paid JC & A to $280,926.80. On December 9, 1996, the INS contracting officer notified JC & A that the INS was denying JC & A's June 26, 1996 Request for Equitable Adjustment in its entirety.

JC & A then filed its first complaint (Case No. 97–839) in this court containing eight counts. Subsequently, JC & A acknowledged to the court that seven of those counts

had not previously been submitted to the INS contracting officer for consideration, and the counts were dismissed, without prejudice, to permit JC & A to do so. The defendant then filed a motion to dismiss the single remaining count, arguing that JC & A also had failed to submit that count to the INS contracting officer, pursuant to the Contract Disputes Act, 41 U.S.C. § 605(a) (1994). In an opinion issued on August 4, 2000, the court granted defendant's motion and dismissed the final count, and the complaint, also without prejudice. *J. Cooper & Assocs., Inc. v. United States,* 47 Fed.Cl. 280 (2000).

After consideration and denial of its claims by the contracting officer, on May 31, 2000, JC & A filed a second complaint (Case No. 00–323), the case currently before the court. An amendment to the second complaint was filed on August 6, 2001. In the case at bar, plaintiff seeks to recover $219,073.00, the difference between the $280,927.00 that the INS already has paid JC & A, and $500,000.00, the Limitation of Government Liability listed in the letter contract extension and modification issued by the INS, which raised the original limitation of government liability above the original $250,000.00. The parties have submitted cross-motions for summary judgment.

## DISCUSSION

The parties have filed cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

**3.** FAR 31.201–4, which is titled "Determining Allocability," states:
 A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. Subject to the foregoing, a cost *is allocable to a Government contract if it(a) is* incurred specifically for the contract; (b) Ben-

efits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or (c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown. 48 C.F.R. § 31.201–4 (1995).

14

entitled to a judgment as a matter of law."
RCFC 56(c); Fed.R.Civ.P. 56(c); *see also
Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986); *Adickes v. S.H. Kress & Co.*, 398 U.S.
144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142
(1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.),
*reh'g denied and reh'g en banc denied* (2001);
*Monon Corp. v. Stoughton Trailers, Inc.*, 239
F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v.
United States*, 100 F.3d 933, 936 (Fed.Cir.
1996), *reh'g denied* (1997); *Creppel v. United
States*, 41 F.3d 627, 630–31 (Fed.Cir.1994).
A fact is material if it will make a difference
in the result of a case under the governing
law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary
judgment. *Anderson v. Liberty Lobby, Inc.*,
477 U.S. at 247–48, 106 S.Ct. 2505; *see also
Monon Corp. v. Stoughton Trailers, Inc.*, 239
F.3d at 1257; *Curtis v. United States*, 144
Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958),
*cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4
L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941,
80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to
weigh the evidence and determine the truth
of the case presented, but to determine
whether there is a genuine issue for trial.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at
249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co.
v. United States*, 157 F.3d 849, 854 (Fed.Cir.
1998) (the nature of a summary judgment
proceeding is such that the trial judge does
not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001); *Becho,
Inc. v. United States*, 47 Fed.Cl. 595, 599
(2000). The judge must determine whether
the evidence presents a disagreement sufficient to require submission to fact finding, or
whether the issues presented are so onesided that one party must prevail as a matter
of law. *Anderson v. Liberty Lobby, Inc.*, 477
U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y
of Dep't of Health and Human Servs.*, 998
F.2d 979, 982 (Fed.Cir.), *reh'g denied and en
banc suggestion declined* (1993). When the
record could not lead a rational trier of fact
to find for the nonmoving party, there is no
genuine issue for trial, and the motion must
be granted. *See, e.g., Matsushita Elec. In*

*dus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986);
*Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548,
1553 n. 3 (Fed.Cir.1996). In such a case,
there is no need for the parties to undertake
the time and expense of a trial, and the
moving party should prevail without further
proceedings. Summary judgment:

> saves the expense and time of a full trial
> when it is unnecessary. When the materi
> al facts are adequately developed in the
> motion papers, a full trial is useless.
> "Useless" in this context means that more
> evidence than is already available in con
> nection with the motion for summary judg
> ment could not reasonably be expected to
> change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15
(1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*,
739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on
other grounds*, 970 F.2d 890 (Fed.Cir.1992);
*United States Steel Corp. v. Vasco Metals
Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011
(1968).

Summary judgment, however, will not be
granted if "the dispute about a material fact
is 'genuine,' that is, if the evidence is such
that a reasonable [trier of fact] could return
a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at
248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr
Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001),
*cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151
L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.
1999). In other words, if the nonmoving
party produces sufficient evidence to raise a
question as to the outcome of the case, then
the motion for summary judgment should be
denied. Any doubt over factual issues must
be resolved in favor of the party opposing
summary judgment, to whom the benefit of
all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348;
*Monon Corp. v. Stoughton Trailers, Inc.*, 239
F.3d at 1257; *Wanlass v. Fedders Corp.*, 145
F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and
en banc suggestion declined* (1998).

The initial burden on the party moving for
summary judgment to produce evidence

showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply be-cause both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir. 1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

The central issue in this case concerns the nature of the contract between JC & A and the INS. Because this is a question of contract interpretation, the court first must examine the letter contract, the only contract signed by the parties. As described above, the first document sent to the SBA from the INS was the July 7, 1995 solicitation letter describing the INS's advertising and marketing needs and requesting the SBA's permission to negotiate an IDIQ contract with JC & A. Due to the urgency of the requirements, the INS also asked that the SBA approve, sign, and return the enclosed separate letter contract request within ten days.

The letter contract, signed by the parties, states: "[T]his letter serves as a contract for J. Cooper and Associates, Inc. to begin urgently needed services by providing the INS

with recruitment support services in accordance with the attached Statement of Work." After the letter text and the signatures of representatives of the INS and JC & A are the words "Accounting and Appropriation Data," followed by internal tracking numbers and the amount "$250,000.00." Page one of the letter states, "RE: INS Letter Contract No. COW–5–C–0017," and page two of the letter contract bears the designation "COW–5–C–0017" in the upper, left-hand corner of the page. Eight pages consisting of FAR provisions follow immediately, and, in common with the second page of the letter portion, each of the eight pages bears the words "Letter Contract No. COW–5–C–0017, J. Cooper & Associates, Inc." at the top of the page in the upper left-hand corner. The last words on the last of the eight pages including the FAR provisions are the words, in brackets, "end of letter contract."

Immediately following and attached to the two pages of the letter contract and the eight pages of FAR provisions are additional pages, titled "Section B—Supplies and Prices," "Section C—Description/Specification/Work Statement" and "Section K—Representations, Certifications and Other Statements of Offerors." Section C also has the designation "COW–5–C–0017" on each page. Section B appears in the record between the initial eight pages of FAR provisions, each page of which bears the contract number "COW–5–C–0017," and Section C, also with the designated "COW–5–C–0017" on each page. Although Section B does not indicate the contract number on each page, this Section includes the only reference in the contract documents to a minimum guarantee, aside from the reference to a minimum guarantee in the solicitation letter, which both parties agree is not part of the contract. The last phrase of Section B states: "Minimum guarantee during the base year valued at $250,000.00," which mirrors the amount of the minimum guarantee identified in the solicitation letter. Section B consists of three not-yet-filled-out pages of forms and four paragraphs of text. "Section C—Description/Specification/Work Statement" appears to be the "attached Statement of Work" mentioned in the letter portion of the contract, since no other information describing the

work to be performed under the letter contract can be found in the documents. As noted above, Section C also bears the designation "COW–5–C–0017" in the upper left-hand corner of every page. "Section K—Representations, Certifications and Other Statements of Offerors," consists of fourteen pages of various provisions, and, although the pages make no specific reference to the letter contract number, in the Appendix submitted by the parties, Section K follows directly after the two page letter contract and the eight pages of FAR provisions plaintiff acknowledges are part of the contract, as well as after Sections B and C.

Contracts with the government for services or supplies typically fit into one of three different categories: " 'those for a definite quantity, those for an indefinite quantity and those for requirements.' " *Ace–Federal Reporters, Inc., v. Barram,* 226 F.3d 1329, 1331 (Fed.Cir.2000) (quoting *Torncello v. United States,* 231 Ct.Cl. 20, 28, 681 F.2d 756, 761–62 (1982)); *accord Mason v. United States,* 222 Ct.Cl. 436, 444, 615 F.2d 1343, 1347 (1980), ("Generally speaking, where services are to be provided to the Government, the contract must be one of three possible types-definite quantity, requirements, or indefinite quantity."), *cert. denied,* 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980). Each of these contracts has specific characteristics. Indefinite delivery, indefinite quantity [IDIQ] contracts and requirements contracts are intended to provide purchasing flexibility to the government "for requirements that it cannot accurately anticipate." *Travel Centre v. Barram,* 236 F.3d 1316, 1318 (Fed.Cir.2001); *accord Stratos Mobile Networks USA v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000); 48 C.F.R. 16.501–2(b)(2) (1995) (subpart 16.5 of 48 C.F.R. is titled Indefinite–Delivery Contracts).

 "[A]n IDIQ contract provides that the government will purchase an indefinite quantity of supplies or services from a contractor during a fixed period of time, it requires the government to order only a stated minimum quantity of supplies or services." *Travel Centre v. Barram,* 236 F.3d at 1319 (citing 48 C.F.R. § 16.504(a) (2000); *Dot Sys. Inc. v. United States,* 231 Ct.Cl. 765, 1982

WL 25218 (1982)); *accord Mason v. United States,* 222 Ct.Cl. at 443 n. 5, 615 F.2d at 1346 n. 5 ("An indefinite quantities contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. It differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller.") (citing *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 67 L.Ed. 1086 (1923) and Corbin, *Contracts* § 157 (1963 & Supp.1971)). Because the buyer is not obligated to purchase all requirements from the seller, unless the buyer contracts to purchase a minimum quantity, an IDIQ contract is "illusory and the contract unenforceable against the seller." *Mason v. United States,* 222 Ct.Cl. at 443 n. 5, 615 F.2d at 1346, n. 5 (citing *Willard, Sutherland & Co. v. United States,* 262 U.S. at 493, 43 S.Ct. 592; Corbin, *Contracts* § 157); *see also Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d 1302, 1304 (Fed.Cir.1998) (characterizing as "well-reasoned" the Housing and Urban Development Board of Contract Appeals decision, which stated: " 'The enforcement of such a contract [an indefinite quantity contract, or a requirements contract] would fail for lack of consideration in the absence of a clause stating a minimum quantity or a clause requiring [HUD] to purchase all of its requirements from [the contractor].' "); *Torncello v. United States,* 231 Ct.Cl. at 28, 681 F.2d at 761 (citing *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086; *Mason v. United States,* 222 Ct.Cl. at 443 n. 5, 615 F.2d at 1346 n. 5; Gavin, *Government Requirements Contracts,* 5 Pub. Cont. L.J. 234, 240–44 (1972)). Therefore, an IDIQ contract:

> requires the government to order only a stated minimum quantity of supplies or services[,] . . . [and] once the government has purchased the minimum quantity stated in an IDIQ contract from the contractor, it is free to purchase additional supplies or services from any other source it chooses. An IDIQ contract does not provide any exclusivity to the contractor.

*Travel Centre v. Barram,* 236 F.3d at 1319. As long as the minimum quantity is not nominal, purchase of that quantity by the government ends any governmental legal obligation under the contract. *Id.* In *Travel Centre v. Barram,* the Federal Circuit held that the satisfaction of a low minimum quantity of only $100.00 ended the government's obligation under an IDIQ contract with a travel agency to provide services to government agencies. *Id.* The Federal Circuit also concluded in *Travel Centre v. Barram* that "[r]egardless of the accuracy of the estimates delineated in the solicitation, based on the language of the solicitation for the IDIQ contract, Travel Centre could not have had a reasonable expectation that any of the government's needs beyond the minimum contract price would necessarily be satisfied under this contract." *Id.*

Conversely, "[a] requirements contract requires the contracting government entity to fill all of its actual requirements for supplies or services that are specified in the contract, during the contract period, by purchases from the contract awardee." *Id.* at 1318–19 (citing 48 C.F.R. § 16.503(a) (2000)); *accord Medart, Inc. v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992); *Mason v. United States,* 222 Ct.Cl. at 442, 615 F.2d at 1346 (stating that a requirements contract obligates a purchaser " 'to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract.' ") (quoting *Media Press, Inc. v. United States,* 215 Ct.Cl. 985, 986, 1977 WL 25915 (1977)). Consideration is satisfied in requirements contracts by the purchaser's agreement to contractually limit its range of future options and to "turn to the seller for all such requirements as do develop." *Torncello v. United States,* 231 Ct.Cl. at 29, 681 F.2d at 761 (citing *Brawley v. United States,* 96 U.S. 168, 172, 13 Ct.Cl. 521, 24 L.Ed. 622 (1878); *Shader Contractors, Inc., v. United States,* 149 Ct.Cl. 535, 540–43, 276 F.2d 1, 4–6 (1960) and Gavin, *Government Requirements Contracts,* 5 Pub. Cont. L.J. at 244–48); *see also Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d at 1332. A purchaser who has entered into a requirements contract with a seller for a specific item may not purchase

that item from any other source for the duration of the contract.

■ "A contract is not unenforceable merely because it does not fit neatly into a recognized category. To be valid and enforceable, a contract must have both consideration to ensure mutuality of obligation, *see generally* Restatement (Second) of Contracts §§ 71, 72 (1981), and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.' *Id.* § 33(2); *see, e.g., Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572–74 (Fed. Cir.1991)." *Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d at 1332; *accord Willard, Sutherland & Co. v. United States*, 262 U.S. at 493, 43 S.Ct. 592 ("There is nothing in the writing which required the government to take, or limit[ ] its demand to, any ascertainable quantity. It must be held that, for lack of consideration and mutuality, the contract was not enforceable.").

Plaintiff JC & A argues that the letter contract was "separate and distinct from the indefinite delivery and indefinite quantity contract that was to be definitized later." Plaintiff also argues that, in the absence of definitization, the letter contract should "be enforced as a requirements contract ... [to] resolve[ ] the conflict between the estimate of $1,600,000 annually in the Offering Letter, and a promised minimum guarantee of $250,000 in task orders for the base year of a proposed, successor Indefinite Delivery, Indefinite Quantity Contract ...." JC & A further argues that the government breached its contract with JC & A by failing to provide work to JC & A in excess of the minimum quantity in the letter contract and by failing to award to JC & A all of the work in the government's pre-contract estimate. Plaintiff does not allege that the government's pre-contract requirements were underestimated or inaccurate, but instead argues that INS requirements awarded to other contractors should have been awarded to JC & A. JC & A attempts to support its position by arguing that only the first eight pages of FAR provisions, ending in the words "end of letter contract", and the letter preceding those provisions, signed by the SBA contract-

ing officer, the INS Supervisory Contracting Officer, and Joseph Cooper for the plaintiff, constitute the letter contract, so that, according to the plaintiff, the minimum quantities defined in "Section B—Supplies and Prices", as well as "Section C—Description/Specification/Work Statement" and "Section K—Representations, Certifications and Other Statements of Offerors," including additional, standard FAR clauses, should not be considered part of the letter contract.

■ Precedent has established that: " 'the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.' " *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed.Cir.1999) (quoting *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965)). "Moreover, the intention of a party entering into a contract is determined by an objective reading of the language of the contract, not by that party's statements in subsequent litigation." *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 799 (Fed.Cir.2002).

■ Review of the record in this case indicates that JC & A knew or should have known that Sections B, C and K were part of the letter contract and also would have been included in a definitized contract if one had been signed by the parties. Included in the eight pages the plaintiff agrees are part of the letter contract is a clause citing to FAR 52.219–12, titled "Special 8(a) Subcontract Conditions." In relevant part it reads: "The Small Business Administration (SBA) has entered into Contract No. COW–5–C–0017 with the INS to furnish the supplies or services as described therein. A copy of the contract is attached hereto and made a part hereof." 48 C.F.R. § 52–219–12 (1995).

Section B contains the minimum work guarantee dollar amount of $250,000.00. The only other indication of that amount is in the solicitation cover letter from the INS to the SBA, which all parties acknowledge is not part of the contract. Section B also contains instructions on contractor personnel, facilities, equipment, material, supplies, services,

fixed price and hourly rates. Section C is the Statement of Work, without which letter contract performance would be impossible. Section C is referred to in the letter contract document, signed by all parties to the contract, as follows: "Therefore, this letter serves as a contract for J. Cooper and Associates, Inc. to begin urgently needed services by providing the INS with recruitment support services in accordance with the attached Statement of Work." Section K follows Sections B and C directly in the Appendix and includes standard FAR clauses, which are generally incorporated by reference into government contracts. As is discussed more fully below, to find, as plaintiff would have the court do, that the letter contract had no minimum guaranteed quantity, no statement of work and does not include such standard FAR clauses is not reasonable.

The plain language of the contract establishes an IDIQ contract between the parties. Although not part of the contract, the solicitation letter from the INS contracting officer to the SBA states: "This office requests permission to negotiate an indefinite delivery, indefinite quantity contract directly with J. Cooper and Associates, Inc. . . . . ." Within the eight pages that even the plaintiff admits are part of the letter contract, following the words "52.216–25 Contract Definitization," appear the words: "(a) A labor hours, indefinite delivery and indefinite quantity contract is contemplated. . . . The Contractor agrees to submit a labor hours, indefinite delivery and indefinite quantity proposal, and cost or pricing data supporting its proposal."

JC & A's interpretation is flawed under the applicable rules of contract interpretation because without the minimum quantity and the statement of work found in Sections B and C the letter contract would be void either for lack of certainty or lack of mutuality. Sections B and C are crucial to the contract. Other than the solicitation letter to the SBA, which is not part of the contract, only in Section B, paragraph B.4, does the language setting a minimum guarantee of work appear, as follows: "Minimum guarantee during the base year valued at $250,000.00." Furthermore, without Section C, the reference in the letter contract to an "attached

Statement of Work" is meaningless. Under JC & A's interpretation, excluding Sections B and C, quantity, delivery, and compensation are not addressed in the contract, voiding the contract for lack of "consideration to ensure mutuality of obligation, *see generally* Restatement (Second) of Contracts §§ 71, 72 (1981), and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.' " *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d at 1332 (quoting Restatement (Second) of Contracts, § 33(2) and citing, e.g., *Aviation Contractor Employees, Inc. v. United States,* 945 F.2d at 1572–74). Without inclusion of a minimum quantity in Section B and the statement of work in Section C, under plaintiff's interpretation that Sections B and C are not part of the letter contract, the contract fails for lack of consideration and "lack of mutuality," because it is unclear what JC & A is exchanging and unclear what the government is obligated to pay under the contract. *Id.* (citing Restatement (Second) of Contracts §§ 71, 72 (1981)). Therefore, under plaintiff's interpretation of the scope of the letter contract, JC & A cannot recover because the contract becomes too indefinite to enforce. Even assuming, for the sake of argument only, that plaintiff correctly interprets the contract as constituting only the eight pages, the Federal Circuit has specifically declined to do what plaintiff urges, i.e., "save an otherwise unenforceable indefinite quantity contract by interpreting it as an 'implied' requirements contract." *Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d at 1304 (citing *Torncello v. United States,* 231 Ct.Cl. at 28–29, 681 F.2d at 761–62).

The court finds defendant's contention that the letter contract includes Sections B, C, and K to be consistent with the settled rules of contract interpretation. *See Torncello v. United States,* 231 Ct.Cl. at 27, 681 F.2d at 761 ("[W]e assume that the parties intended that a binding contract be formed. Thus, any choice of alternative interpretations, with one interpretation saving the contract and the other voiding it, should be resolved in favor of the interpretation that saves the contract.") (citing *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855 (1978), and cases cited therein; *Hol–Gar Mfg. Corp. v. United*

*States,* 169 Ct.Cl. 384, 351 F.2d 972, and cases cited therein). Courts have been loathe to interpret a contract out of existence. When a contract interpretation results in a one-sided bargain, bordering upon a lack of mutuality, the " 'contract should not be given this construction if it can be avoided.' " *E.H. Sales, Inc. v. United States,* 169 Ct.Cl. 269, 273, 340 F.2d 358, 360 (1965) (quoting *Goldwasser v. United States,* 163 Ct.Cl. 450, 454, 325 F.2d 722, 724 (1963)).

Plaintiff's conduct and the pleadings filed with this court also demonstrate that JC & A understood that the letter contract included Sections B, C, and K and that the letter contract was an IDIQ contract. In plaintiff's separately proposed facts, filed with this court, plaintiff contends: "The letter contract contained no provision authorizing the INS to obtain any of its support services requirements elsewhere." In support, plaintiff cites to pages twenty-three to fifty-six in the Appendix to the Joint Stipulation of Facts, pages which include the solicitation letter, the eight pages of FAR provisions which plaintiff alleges constitute the whole of the contract, as well as the Section titled "Section B—Supplies and Prices," the Section titled "Section C—Description/Specification/Work Statement," and the Section titled "Section K—Representations, Certifications and Other Statements of Offerors," which plaintiff now is asserting are not part of the letter contract.

Additionally, paragraph seventeen of the Joint Stipulation of Facts filed with this court states: "The letter contract provided, among other things, that the INS was to provide J. Cooper with task statements describing specific work to be performed, including deliverable and required time frames." In support of this proposition, the Joint Stipulation of Facts. filed together by both the defendant and the plaintiff, references Appendix page forty-one, which is in "Section C—Description/Specification/Work Statement," and specifically Section C, paragraph 5.5.1, which states:

> INS will provide the contractor with a task statement describing the specific work to be performed under one of the general tasks [found in Section C]. The description

will include deliverable and required time frames. The contractor will furnish INS a proposal, including labor hours and other direct costs within 10 workdays. When INS and the contractor reach agreement on the work to be done and the resources required, the INS Contracting Officer will issue a task order for the work to proceed. Agreed upon deliverables will be furnished to INS on the schedule agreed to in the task order and for the firm fixed price established in the task order.

In addition, plaintiff's original complaint in the first action filed in this court includes as one of its counts that "[t]he INS breached the contract by failing to issue written task orders to JCA." The original complaint goes on to state: "Paragraph 5.5 of Section C of the Letter Contract specifically defines the INS' obligation to issue such task orders," and then references the passage from Section C quoted above. Moreover, the plaintiff's motion for partial summary judgment in the first action filed in this court includes a joint stipulation of facts relied on by the plaintiff, which repeatedly makes reference to Sections B and C as part of the letter contract.

Furthermore, when the oral task orders were initially issued by the INS, the plaintiff acknowledged that the attached Section C was binding on the parties and part of the letter contract by objecting to the issuance of oral task orders by the INS, rather than having written task orders issued, as plaintiff argued was required by the above-mentioned provision 5.5.1 in Section C. In his affidavit, JC & A principal and president Joseph N. Cooper points out: "Because the Contract provided that the INS was supposed to issue written task orders, I and other JCA representatives expressed our concern to personnel in the INS contracts office ('Contracts Office') about the Program Office personnel's procedure of issuing oral task orders under the Letter Contract."

Plaintiff's conduct of submitting a monthly project report to the INS on August 5, 1995, demonstrated an understanding that the attached Section C was part of the letter contract, apparently pursuant to paragraph 5.2 of attached Section C, which states:

By the fifth workday each month the contractor will provide the COTR [Contracting Officer Technical Representative] a written progress report on contracted task(s). This report will highlight key activities, such as sites visited, transactions tested, deliverables provided, deliverables due in the following reporting periods. Progress will be mapped to milestones in the Task Action Plan. The reports should also highlight concerns, issues, and impediments to the contractor's ability to complete the task.

As required by Section C, the record in this case includes, for example, the August 5, 1995 monthly report from JC & A to the INS detailing the activities that had taken place, including a site visit by JC & A, and ongoing issues in the project.

Finally, in the October 20, 1995 letter from JC & A to the INS protesting the non-issuance of additional task orders, JC & A demonstrated acceptance of the attached contract Sections as part of the letter contract. In pertinent part, the October 20, 1995 letter refers to the "scope of work outlined in the contract," to a "long term campaign outlined in the contract," and objects to the fact that JC & A had been requested to do work of an administrative nature rather than "the tasks called for in the contract statement of work." In all of these instances, plaintiff can only be referring to contract Section C, even though plaintiff now contends Section C was not part of the letter contract.

Plaintiff's pleadings and conduct, therefore, demonstrate an acceptance of the disputed Sections B, C and K as part of the letter contract between plaintiff and the INS. Plaintiff cannot argue now that those Sections are not part of the contract when it is to its advantage. In sum, this court finds that the contract which came into existence between the parties includes contract Sections B, C and K, and was an IDIQ contract with a stated minimum quantity of $250,000.00.

Pursuant to this court's finding that the letter contract was an IDIQ contract, JC & A is entitled only to work equal to the minimum quantity of $250,000.00 specified in the contract. Having purchased the minimum quantity stated in the IDIQ contract from the contractor, the INS was free to purchase additional supplies or services from other sources. *See Travel Centre v. Barram*, 236 F.3d at 1319. "An IDIQ contract does not provide any exclusivity to the contractor." *Id.* The minimum quantity guaranteed to JC & A, $250,000.00, was not nominal, so purchase of that quantity by the government ended the government's legal obligation. 48 C.F.R. § 16.504(a)(2) (1995). Regardless of the accuracy of the estimates of the total work to be performed, or the amount of potentially available funds identified in the limitation of liability clauses, whether $250,000.00 in the original letter contract, or $500,000.00 in the September 30, 1995 modification, the plaintiff should have understood that it was guaranteed no more than $250,000.00 worth of task orders. Based on the language of the solicitation for the IDIQ contract and the letter contract language, in the words of the Federal Circuit in *Travel Centre v. Barram*, JC & A "could not have had a reasonable expectation that any of the government's needs beyond the minimum contract price would necessarily be satisfied under this contract." *Travel Centre v. Barram*, 236 F.3d at 1319.

Plaintiff also alleges a breach by the INS resulting from the decision to allow the letter contract to lapse rather than to terminate the contract. Although plaintiff sought a termination for convenience from the government, the termination was not issued and the letter contract was allowed to lapse without being definitized. In a May 16, 1996 letter from the INS to the SBA, the INS indicated that the government had audited the contractor and had found JC & A's accounting system inadequate and that the INS program office "believes the contractor has not delivered quality products and services, requesting a termination for default." The May 16, 1996 letter continued:

Consequently, INS has concluded that pursuing definitization, and/or continuing performance under this contract, in light of these issues, would not be in the best interest of either party.

The proposed course of action for final and complete resolution of the problems between INS and Cooper, is to allow the agreement to lapse and request the contractor to prepare a proposal for costs incurred in the performance of the contract. We anticipate a negotiated settlement of reasonable, allowable, and allocable costs for work performed under task orders. Support of this strategy is requested from Small Business Administration as a reasonable alternative to termination.

Although staff in the INS Program Office were requesting a termination for default, because no task orders were interrupted or terminated by the INS by its decision to allow the letter contract to lapse, and the INS had paid JC & A in excess of the minimum guarantee in the letter contract, the INS was under no obligation to terminate the contract for convenience.

Moreover, contrary to plaintiff's assertions, no constructive termination for convenience occurred. As the Federal Circuit recently pointed out in *White v. Delta Construction International, Inc.,* "[a]ll that the court held in *Maxima [Corp. v. United States]* was that the government could not retroactively terminate the contract for convenience after the contract had been fully performed." *White v. Delta Constr. Int'l, Inc.,* 285 F.3d 1040, 1044 (Fed.Cir.2002) (referring to *Maxima Corp. v. United States,* 847 F.2d 1549 (Fed. Cir.1988)); *see also Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d at 1333 (" '[N]o decision has upheld retroactive application of a termination for convenience clause to a contract that had been fully performed in accordance with its terms.' *Maxima Corp. v. United States,* 847 F.2d 1549, 1557 (Fed.Cir. 1988). We see no reason in law or logic to impose a retroactive constructive termination for convenience here."); *cf. Krygoski Constr. Co. v. United States,* 94 F.3d 1537, 1542 n. 2 (Fed.Cir.1996), *cert. denied,* 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997).

Contrary to plaintiff's arguments, the provision which appears in the original letter contract, FAR 52.216–24, titled "Limitation of Government Liability," and in the modification which raised the maximum government liability to $500,000.00, provides JC & A no right to damages. Although the Limitation of Government Liability provision limits government liability, it does not guarantee that the maximum amount necessarily will be paid to the contractor. The contract entered into by the parties was not for a fixed price. After accepting $30,000.00 in excess of the $250,000.00 minimum guarantee and performing no further task orders, the government was not obligated to pay JC & A additional monies unless additional work was performed. Because the minimum guarantee under the IDIQ letter contract had been met and all task orders issued to JC & A were completed, JC & A's actions after that time in attending meetings, including meetings with the DCAA to support prior invoices, hiring consultants, and preparing technical and price proposals for future task orders were actions and risks JC & A voluntarily assumed in hopes of documenting previously submitted invoices and receiving additional task orders from the INS. These actions by JC & A are not reimbursable under the letter contract.

In the United States Court of Claims opinion in *Dot Systems, Inc. v. United States,* recently cited favorably by the Federal Circuit in *Travel Centre v. Barram,* 236 F.3d at 1319, Dot Systems entered into an IDIQ contract with the Environmental Protection Agency (EPA) to perform typing services which required Dot Systems to maintain an office in North Carolina. *Dot Sys., Inc. v. United States,* 231 Ct.Cl. at 765–66. The contract in *Dot Systems* guaranteed only $500.00 worth of work, but estimated utilization in the amount of $11,689.00 for the first contract period and a total of $397,889.00 for three optional one-year extension periods. *Id.* at 766. Dot Systems, however, received much less work than it had expected under the contract. *Id.* Dot Systems became slow in performing, and the government terminated the contract for default. *Id.* Dot Systems sued for contract breach. In finding for the government, the court held: "The general rule is clear: a contractor cannot sign a contract which allocates the risk to it and then ... come to this court, having lost its

gamble, and insist that the risk be placed on the Government." *Id.* at 768 (citing *Gregory Lumber Co. v. United States,* 230 Ct.Cl. 1041 (1982); *Caffall Bros. Forest Prods., Inc. v. United States,* 230 Ct.Cl. 517, 678 F.2d 1071, *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982); *Webco Lumber, Inc. v. United States,* 230 Ct.Cl. 457, 677 F.2d 860 (1982)). The court reasoned that Dot Systems understood it was assuming the risk that it may not receive work beyond the minimum guarantee because the bid solicitation made it clear that the contract was an IDIQ contract and that the estimates therein were not guarantees, and in its bid and in conversations with contracting officials the plaintiff recognized that it was taking a risk. *Dot Sys., Inc. v. United States,* 231 Ct.Cl. at 769.

On entering into the contract in the case before the court, JC & A assumed the risk that the INS might not be satisfied with JC & A's work or might simply choose not to order more than the minimum quantity stated in the contract. This court finds that the INS has no legal obligation to compensate JC & A beyond the minimum guarantee in the contract. The letter contract between the parties was an IDIQ contract, which guaranteed only $250,000.00 of work to JC & A.

JC & A also charges bad faith on the part of the INS. JC & A alleges that when the INS was asked about future task orders, the INS assured JC & A of additional work. Subsequently, three additional work proposals were solicited by the INS from JC & A, but the INS did not award the work to JC & A. At least with respect to one of the plaintiff's submissions, according to the INS, the price proposal from JC & A was too high, although a later independent government estimate placed the cost for that task order even higher. JC & A contends it expended funds in reliance on INS assurances of future work, and that the INS acted in bad faith, arbitrarily and capriciously denying JC & A the opportunity to perform the future work. Additionally, JC & A asserts the INS breached its duties of good faith and fair dealing by ordering services from other contractors without notifying JC & A.

The court proceeds from a "strong presumption that government officials ... carry out their duties lawfully and in good faith." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1238 (Fed.Cir. 2002); *accord T & M Distribs., Inc. v. United States,* 185 F.3d 1279, 1285 (Fed.Cir.1999); *Morganti Nat'l, Inc. v. United States,* 49 Fed.Cl. 110, 143 (2001), *aff'd,* 36 Fed.Appx. 452, 2002 WL 1271968 (Fed.Cir.2002). Proving a government official has violated the duty of good faith requires a "high burden of proof," recently defined by the United States Court of Appeals for the Federal Circuit as "clear and convincing" evidence to overcome the presumption in the government's favor. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1238–39 ("[W]e believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the governments [sic] good faith."). This burden of proof, formerly described by the Federal Circuit as well-nigh irrefragable proof, is firmly established in our jurisprudence. *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1239 (citing *T & M Distribs., Inc. v. United States,* 185 F.3d at 1285; *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d at 770; *Schaefer v. United States,* 224 Ct.Cl. 541, 633 F.2d 945, 948–49 (1980); *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1302 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Grover v. United States,* 200 Ct.Cl. 337, 344, 1973 WL 21332 (1973)).

The burden to overcome the presumption that a government official acted properly and in good faith is substantial; a bad faith claim cannot be substantiated without meeting a "high evidentiary burden of proof." *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1236. The Federal Circuit in *Am–Pro Protective Agency, Inc. v. United States* elaborated: "Specifically, we have described clear and convincing burden as such ... 'evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Id.* at 1240 (quoting *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir.1993) (citations omitted)). The court in *Am–Pro Protective*

*Agency, Inc. v. United States* described the type of proof necessary to establish what was previously denominated as "well-nigh irrefragable proof" as follows:

> In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff. Thus, in *Gadsden v. United States[,* 111 Ct.Cl. 487, 78 F.Supp. 126 (1948)], the court compared bad faith to actions which are "motivated alone by malice." In *Knotts [v. United States,* 128 Ct.Cl. 489, 121 F.Supp. 630 (1954)], the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co.· v. United States[,* 96 Ct.Cl. 186, 1942 WL 4411 (1942)], found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach [v. United States,* 147 Ct.Cl. 605, 1959 WL 7633 (1959)], the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

*Id.* (quoting *Kalvar Corp. v. United States,* 211 Ct.Cl. at 192, 543 F.2d at 1302 (citations omitted)). In addition, the Federal Circuit has stated: " '[S]ubterfuges and evasions violate the obligation of good faith,' as does lack of diligence and interference with or failure to cooperate in the other party's performance." *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988) (quoting Restatement (Second) of Contracts § 205 comment d (1981)).

The evidence in the record presented to the court establishes that the defendant must prevail on summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d at 982. Drawing all reasonable inferences against the government, whose motion is under consideration, *Gart v. Logitech, Inc.,* 254 F.3d at 1338–39; *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d at 1322, plaintiff has failed to carry the necessary "clear and convincing" burden of proof sufficient to overcome the presumption that the government has acted in good faith. *Am–Pro Protective*

*Agency, Inc. v. United States,* 281 F.3d at 1238–39. The evidence fails to produce "an abiding conviction" that JC & A's assertion of bad faith on the part of the government is " 'highly probable.' " *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1240 (quoting *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir.1993) (citations omitted)).

■ JC & A relies on little more than "bald assertions and speculation of wrongful conduct" to substantiate its claims that the government acted in bad faith, which alone are insufficient. *T & M Distribs., Inc. v. United States,* 185 F.3d at 1285 (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d at 627; *Ground Saucer Watch, Inc. v. CIA,* 692 F.2d 770, 772–73 (D.C.Cir.1981)). There is no evidence that the issuance of work orders by the INS did not comport with standards of good faith. The INS became dissatisfied with JC & A's accounting practices, pricing, and work quality, as indicated in the May 16, 1996 letter from the INS to the SBA, which stated: "The DCAA concluded in December 1995, that the contractor's accounting system was inadequate.... In addition, the contractor has priced prospective INS requirements outside the realm of reasonableness and affordability from this agency's perspective." In the same letter, the INS indicated that "the program office believes the contractor has not delivered quality products and services ...." Nevertheless, having satisfied the contract's minimum guarantee, the INS still was willing to discuss additional task order proposals from JC & A. When one of JC & A's resulting proposals was more than ten times an estimate the INS had obtained from one of JC & A's competitors, the INS informed JC & A that their proposal was unacceptable and declined to grant to JC & A the task order. There is no evidence to suggest the INS acted in bad faith in believing, based on the estimate it had in hand, that JC & A's proposal was unreasonable, although a subsequent Independent Government Estimate was, in fact, somewhat higher than JC & A's cost proposal.

Despite the dissatisfaction with JC & A's performance in the past on the part of the INS, the solicitation for additional task pro-

posals from JC & A reflects a good faith attempt by the INS to allow plaintiff another chance. In a February 12, 1996 meeting with personnel from the INS, the SBA, and the DCAA, the INS Director of Contracts so stated. The minutes of that meeting reveal the following:

> INS stated that at this point their preference is to meet their $250,000 threshold of obligation under the letter contract and terminate their involvement with this company [JC & A]. However, Linda [INS Director of Contracts] stated that in all fairness to the company, she will issue them one more task to give them another chance to perform. She said that she had to urge her customer [the INS] to issue another task order in light of all the previous problems.

Because the INS had actually paid JC & A $280.927.00, more than $30,000.00 in excess of what it was required to pay JC & A under the $250,000.00 minimum guarantee in the letter contract, the INS was under no obligation to turn to JC & A for any additional services, even if JC & A's price proposal was reasonable, or to reimburse JC & A for any monies expended in trying to receive additional task orders.

 The plaintiff's remaining claims that the government acted in bad faith by failing to notify JC & A that it was using other contractors to fulfill needs described in the statement of work also are groundless. The government was under no obligation to inform JC & A that other contractors were being used to satisfy INS needs. JC & A was entitled only to the $250,000.00 minimum guarantee listed in the letter contract, regardless of the work tasked to other contractors.

There is no indication in the record of bad faith on the part of INS officials. There is no evidence of "specific intent to injure" JC & A, of actions "motivated alone by malice," of a "proven 'conspiracy to get rid of plaintiff,'" or of "designedly oppressive" measures. *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1240 (citations omitted). Nothing suggests INS officials were "actuated by animus toward the plaintiff," *id.*, nor does it appear that they engaged in "subterfuges and evasions," were lacking in diligence, or interfered with or "fail[ed] to cooperate in the other party's performance." *Malone v. United States*, 849 F.2d at 1445 (citation omitted). Mere speculation on the part of the plaintiff is an insufficient basis to meet the rigorous test to establish bad faith.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED,** and defendant's cross-motion for summary judgment is **GRANTED.** The Clerk's Office shall enter **JUDGMENT** consistent with this opinion. Each party shall bear its own costs.

**IT IS SO ORDERED.**