ABF FREIGHT SYSTEM, INC., Old Dominion Freight Line, Inc., Overnite Transportation Co., Roadway Express, Inc., Yellow Transportation, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 02–1807 C.

United States Court of Federal Claims.

Feb. 26, 2003.

John R. Bagileo, Washington, DC, for plaintiff. Claire L. Shapiro, Washington, DC, of counsel.

Michael F. Kiely, with whom were Robert D. McCallum, Assistant Attorney General, David M. Cohen, Director, and Bryant G. Snee, Assistant Director, United States Department of Justice, Washington, DC, for defendant. Maj. Arthur J. Coulter, United States Army Contract Appeals Division, Arlington, VA, of counsel.

### OPINION AND ORDER

HEWITT, Judge.

This is a post-award bid protest filed by five freight transportation companies, ABF Freight System, Inc. (ABF), Old Dominion Freight Line, Inc. (Old Dominion), Overnite Transportation Co. (Overnite), Roadway Express, Inc. (Roadway), and Yellow Transportation, Inc. (Yellow), challenging the terms of a solicitation issued by the United States, acting through the Department of the Army and Headquarters Military Traffic Management Command (MTMC or agency). The parties have filed cross-motions for judgment on the administrative record in accordance with Rule 56.1 of the Court of Federal Claims (RCFC). For the following reasons, defendant's motion is GRANTED. Plaintiffs' motion is DENIED.

---

1. Facts relied on in this opinion and cited to only one of the parties' statement of facts or other

## I. Background [1]

MTMC provides the transportation needed by the Department of Defense (DOD) to move DOD freight traffic and shipments of foreign military sales materials. Administrative Record (A.R.) at 251. On June 21, 2002, MTMC issued Solicitation No. DAMT01–02–R–0060 (solicitation) for multiple Tailored Transportation Contracts. Defendant's Statement of Facts Accompanying Its Motion for Summary Judgment (Def.'s Facts) ¶ 1; A.R. at 245–48. The solicitation was a negotiated procurement designed to procure freight transportation services under Federal Acquisition Regulation (FAR) Parts 12 and 15. Def.'s Facts ¶¶ 4, 6. Consistent with MTMC's initiative to transition the Guaranteed Traffic (GT) Tenders program to the FAR, see 65 Fed.Reg. 45,362 (Jul. 21, 2000), this was the first solicitation for such services to be subject to the FAR. Plaintiffs' Statement of Facts Accompanying Their Cross–Motion for Summary Judgment (Pls.' Facts) ¶¶ 2–3.

The solicitation anticipated a one-year base contract with two one-year options. A.R. at 18. The solicitation informed all potential offerors that multiple indefinite delivery/indefinite quantity (ID/IQ) contracts, as governed by FAR Subpart 16.5, would be awarded for all transportation lanes within defined geographical regions of the United States based upon the best value to the government. Def.'s Facts ¶¶ 7, 18. The solicitation was amended twelve times. Def.'s Facts ¶ 21.

The originally scheduled closing date for receipt of proposals was August 2, 2002. A.R. at 248. The actual closing date for receipt of proposals, as extended, was October 24, 2002. Def.'s Facts ¶ 26. Contracts under the solicitation were awarded on December 6, 2002. Complaint (Compl.) ¶ 24.

Plaintiffs complain that the Army was arbitrary and capricious and lacked a reasonable basis in the manner that it (1) executed Amendment 12 to the solicitation, Complaint (Compl.) ¶¶ 25–32; (2) established prices for all anticipated accessorial services. Compl. ¶¶ 33–41; (3) proposed handling the recovery

filings do not appear to be in dispute.

of the costs of accessorial services, Compl. ¶¶ 42–55; (4) established the minimum quantities to be ordered under the contracts resulting from the solicitation, Compl. ¶¶ 56–64; and (5) used a regional structure for the transportation contracts in question. Compl. ¶¶ 65–74.

Defendant challenges the standing of Old Dominion to bring this action because Old Dominion did not submit a bid. Defendant's Motion for Summary Judgment Upon the Administrative Record (Def.'s Mot.) at 12–14. Defendant asserts that the other plaintiffs failed to file this protest timely. *Id.* at 14–16. Alternatively, defendant argues that the Army handled the procurement reasonably and in accordance with law. *Id.* at 16–22.

II. Discussion

A. Standards of Review

The standard of review for a motion for summary judgment upon the administrative record under RCFC 56.1 is the same as for a motion for summary judgment under RCFC 56. *N.C. Div. of Servs. For Blind v. United States*, 53 Fed.Cl. 147, 157 (2002). Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *Id.* (citing RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed.Cir.1987)). A genuine dispute of material fact that may significantly affect the outcome of the matter precludes the entry of judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. When considering cross-motions for summary judgment, the court evaluates each motion under the same standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 450, 457 (1999).

In a post-award bid protest, "courts shall review the agency's decision pursuant to the standards set forth in section 706 of Title 5 [the Administrative Procedure Act]." 28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001) (*Impresa*); *RAMCOR Servs. Group, Inc., v. United States*, 185 F.3d 1286, 1290 (Fed.Cir.1999)

("The ADRA [Administrative Dispute Resolution Act of 1996] explicitly imports the A[dministrative] P[rocedure] A[ct] standards of review into the Court of Federal Claims' review of agency decisions."). Judicial review of an agency's procurement decisions is "extremely limited." *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 725 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). "[A]n agency's procurement decisions will be upheld unless shown to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Process Control Techs. v. United States*, 53 Fed.Cl. 71, 75 (2002) (quoting 5 U.S.C. § 706).

■ Because the protesters here are not challenging the rationale followed by MTMC in evaluating proposals and making the contract awards, but rather the terms of the solicitation, *see* Compl. ¶ 14, the court must examine the challenged solicitation. A solicitation must seek proposals that meet an agency's minimum needs, or else the solicitation represents an undue, improper restriction on competition. *XTRA Lease, Inc. v. United States*, 50 Fed.Cl. 612, 624 (2001) (citing *SMS Sys. Maint. Services, Inc.*, Comp. Gen. Dec. B–270,816, 96–1 CPD ¶ 212, 1996 WL 207103 (1996); *Fed. Data Corp. v. Dept. of Justice*, GSBCA No. 12264–P, 94–1 B.C.A. ¶ 26,324, 1993 WL 306145 (1993); *Integrated Sys. Group, Inc. v. Dept. of Navy*, GSBCA No. 12127–P, 93–2 B.C.A. ¶ 25,637, 1992 WL 360143 (1992)). In short, solicitations must have a rational relationship to agency needs, must not be unduly restrictive, and should be written in as non-restrictive a manner as possible in order to enhance competition and invite innovation. *See XTRA Lease, Inc.*, 50 Fed.Cl. at 624 (citing *Fed. Data Corp.*, 94–1 B.C.A. ¶ 26,324, 1993 WL 306145).

■ Plaintiffs seek injunctive relief based upon alleged errors by the agency in this procurement. Injunctive relief for a disappointed bidder is appropriate "only in extremely limited circumstances." *CCL Serv. Corp. v. United States*, 48 Fed.Cl. 113, 120 (2000) (quoting *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983))).

Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 732 (2000) (citing *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991)). To obtain injunctive relief, a plaintiff must show (1) either a likelihood or actual success on the merits of the case; (2) that it will suffer irreparable injury unless injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that no harm will be inflicted upon the public interest. *SDS Int'l, Inc. v. United States,* 55 Fed.Cl. 363 (2003); *Bean Stuyvesant L.L.C. v. United States,* 48 Fed.Cl. 303, 320–21 (2000). The decision whether or not to grant an injunction is within the sound discretion of the trial court. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993).

### B. Whether Plaintiffs Have Standing to Bring a Protest

Because standing is a threshold jurisdictional issue, the court considers this issue first. *See Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir.2003) (*ITAC*); *Myers Investigative and Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (*Myers*) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). The Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment on *an action by an interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (emphasis added). The court's jurisdictional statute, however, does not define the term "interested party." *See ATA Def. Indus.,* 38 Fed.Cl. at 494.

■ The Federal Circuit has held that, in bid protests under the Tucker Act, the term "interested party" in § 1491(b) is to be construed in accordance with the standing requirements of the Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551–56. *Am. Fed'n of Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE*). Consistent with the standing requirements of CICA, the Federal Circuit has interpreted the term "interested party" under § 1491(b)(1) to mean "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* To establish standing, "a potential bidder must establish that it had a substantial chance of securing the award." *Myers,* 275 F.3d at 1370; *Impresa,* 238 F.3d at 1334; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581–82 (Fed.Cir.1996)); *see also ITAC,* 316 F.3d at 1320 (stating that a "protester's chance of securing the award must not have been insubstantial").

■ "[W]here the plaintiff claims that the government [is] obligated to rebid the contract," as plaintiffs in this case claim,[2] the Federal Circuit has addressed the applicable standard for establishing standing. *Myers,* 275 F.3d at 1370 (citing *Impresa,* 238 F.3d at 1334). The Federal Circuit instructs that "[t]o have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive." *Id.* The Federal Circuit further instructs that "prejudice (or injury) is a necessary element of standing." *Myers,* 275 F.3d at 1370. "The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]." *Myers,* 275 F.3d at 1369 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001) (challenging a sole source procurement).

This protest was filed by five plaintiffs: (1) three of whom received awards, (2) one of whom bid but did not receive an award, and (3) one of whom did not bid. The court

---

**2.** *See* Compl. pp. 12–13.

examines whether plaintiffs have standing to bring this action.

### 1. The Contract Awardees

█ Defendant challenges the claims of the contract awardees as untimely but has not challenged their standing to bring this protest action. *See* Def.'s Mot. at 12–16. The court, consistent with RCFC 1 and 56(c), considers whether judgment as a matter of law is appropriate on the issue of standing with respect to these three plaintiffs. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 102–104, 118 S.Ct. 1003.

The parties do not dispute that plaintiffs Overnite, Roadway, and Yellow received contract awards under the solicitation. Compl. ¶¶ 4–6; A.R. at 599, 601, 604. The Federal Circuit has interpreted the post-award bid protest jurisdiction of this court contained in 28 U.S.C. § 1491(b)(1) (enacted as part of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870 (1996)) to be limited to "disappointed bidders." *AFGE*, 258 F.3d at 1302. The court does not see how a plaintiff asserting claims pertaining to a contract it has made with the government could be a "disappointed bidder" for bid protest purposes. *See Davis/HRGM Joint Venture v. United States*, 50 Fed.Cl. 539, 545 (2001) (citing *Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 77–80 (D.C.Cir. 1985)). Rather, such a plaintiff is a contractor asserting a claim "relating to a contract" and is subject to the Contract Disputes Act jurisdiction of this court, as set forth in 41 U.S.C. § 609. *See Davis/HRGM Joint Venture*, 50 Fed.Cl. at 545 (citing *Ingersoll–Rand Co.*, 780 F.2d at 77–80); *C'mty. Consulting Int'l*, ASBCA No. 53,489, 02–2 B.C.A. ¶ 31,940, 2002 WL 1788535 (2002). Because plaintiffs Overnite, Roadway, and Yellow received contract awards under the solicitation complained of, they are not disappointed bidders and do not have standing to assert this protest. Accordingly, the claims of plaintiffs Overnite, Roadway, and Yellow are DISMISSED without prejudice for lack of jurisdiction.

### 2. The Disappointed Bidder

As with the contract awardees, defendant also challenges the claim of ABF as untimely, but has not challenged ABF's standing. *See* Def.'s Mot. at 12–16. ABF was a qualified bidder that had previously performed some four million dollars worth of similar business for defendant. *See* Tr. at 68. ABF submitted an offer in response to the solicitation, *see* A.R. at 579, was determined to be within the competitive range established on September 2002, *see* Tr. at 51–53, but did not receive a contract award. *See* A.R. at 579. Of the 57 proposals received by the agency in response to the solicitation, 56 contract awards were made. A.R. at 579.

ABF has established that it " 'could compete for the contract' " if the alleged bid process improprieties were cured. *See Myers*, 275 F.3d at 1370; *Impresa*, 238 F.3d at 1334 (noting that if the government were "obligated to rebid the contract, ... [the protester] could compete for the contract once again"). As an "actual ... bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," *AFGE*, 258 F.3d at 1302, ABF Freight Systems has standing to bring this bid protest action.

### 3. The No–Bid Protester

█ Defendant alleges that Old Dominion lacks standing under this court's bid protest jurisdiction because it is not an "interested party" under the Tucker Act. Def.'s Mot. at 12. Defendant asserts that Old Dominion cannot be viewed as an actual or prospective bidder or offeror under the solicitation because it did not submit a proposal. *Id.* at 14 (citing *Impresa*, 238 F.3d at 1334).

Plaintiffs contend that Old Dominion was a prospective bidder or offeror. Plaintiffs' Cross–Motion for Summary Judgment Upon the Administrative Record and Opposition to Defendant's Motion for Summary Judgment (Pls.' Opp.) at 12 (citing *ATA Def. Indus.*, 38 Fed.Cl. at 494 (looking to the language of the now-repealed Brooks Act for guidance in defining the term "interested party")). Reasoning that "prospective" means "likely or expected," Pls.' Opp. at 12, plaintiffs asserts that Old Dominion "would have competed under a properly-fashioned contract and would have [had] a reasonable chance of

award." *Id.* at 13. In support of their position, plaintiffs point out that: (1) Old Dominion is a motor carrier qualified to transport DOD freight; (2) Old Dominion currently provides transportation services to DOD that are within the scope of the solicitation challenged here; and (3) Old Dominion obtained, reviewed, and met with the agency regarding the solicitation. *Id.* at 12. Plaintiffs argue that Old Dominion's "determin[ation] that it could not submit a proposal under the improper and objectionable terms and conditions set forth in the solicitation" does not disturb its status as a prospective bidder. *Id.*

There are several decisions which provide some guidance to the court in deciding whether Old Dominion has established standing as a "prospective bidder." In at least two instances, the Federal Circuit has found that a no-bid protester lacked standing to bring a bid protest action. *Fed. Data Corp. v. United States,* 911 F.2d 699 (Fed.Cir. 1990); *MCI Telecommunications Corp. v. United States,* 878 F.2d 362 (Fed.Cir.1989).

In *Fed. Data Corp.,* the Federal Circuit construed the term "interested party" as used in the Brooks Act, 40 U.S.C. § 759 (*repealed by* the Clinger–Cohen Act, Pub.L. No. 104–106, § 5101, 110 Stat. 680 (1996)), which authorized bid protests of automated data processing equipment procurements to be filed before the General Services Administration's Board of Contract Appeals.[3] 911 F.2d at 703. In *Fed. Data Corp.,* the protester seeking standing was an unsuccessful bidder that had withdrawn from the procurement. The Federal Circuit stated:

[T]he right to protest an agency's procurement practices before the board is limited and may be exercised only by an actual or *prospective bidder who would have been in a position to receive the challenged award.* The board's protest authority does not extend to disappointed bidders who have no chance of receiving the contract.

*Id.* (citing *United States v. Int'l Bus. Machs. Corp.,* 892 F.2d 1006, 1010 (Fed.Cir.1989)) (emphasis added).

More recently, in *Myers,* a protest challenging a sole source procurement, the Federal Circuit stated that the plaintiff who had not submitted a bid lacked standing because it had failed to "show that it would have been a qualified bidder." 275 F.3d at 1370–71. Absent such a showing, the plaintiff could not establish that it was an interested party with standing to bring the action. *Id.* Here, however, ABF is not only conceded to be qualified, *see* Tr. at 67–68, but was determined to be within the competitive range. Tr. at 51–53.

In this case, defendant has conceded that all of the plaintiffs in this action "would be responsible." Transcript of Oral Argument on January 29, 2003(Tr.) at 67. In this context, the court takes this as a concession that the "qualified bidder" point in *Myers* is not disputed.

Reviewing a pre-award Brooks Act protest in *MCI Telecommunications Corp.,* the Federal Circuit stated that, in order to be eligible to protest as a prospective bidder, "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation." 878 F.2d at 365. The Federal Circuit reasoned that "the solicitation must be outstanding when protested in order for those having not yet submitted bids to be considered prospective bidders on the proposed contract." *Id.* (citing *Waste Mgmt. of N. Am., Inc. v. Weinberger,* 862 F.2d 1393, 1398 (9th Cir.1988)) (to "qualify as a 'prospective' bidder, [complainant] must have filed a bid protest or become an 'actual' bidder by submitting a bid"). The Brooks Act provisions construed in *MCI Telecommunications Corp.* have now been superseded by the ADRA.

Absent guidance under the ADRA analogous to the *MCI Telecommunications Corp.* holding under the Brooks Act, the court considers whether Old Dominion has demonstrated that it had a "substantial chance" of

---

3. Because the definition of the term "interested party" in the now-repealed Brooks Act is analogous to the definition of the term "interested party" in the Competition in Contracting Act

(CICA), the court finds the Federal Circuit's reasoning in *Fed. Data Corp.* instructive here. *See AFGE,* 258 F.3d at 1299.

receiving the award absent the illegality complained of. *See Impresa,* 238 F.3d at 1334. A protester may satisfy its evidentiary burden by establishing that its chance of winning the award was "greater than ... insubstantial ... if successful on the merits of the bid protest" as the Federal Circuit recently stated in *ITAC. See* 316 F.3d at 1319.

Although Old Dominion did not submit a bid, the plaintiff is a current provider of services to DOD that are within the scope of the challenged solicitation in this case and did actually participate in the bid preparation process before deciding against submitting its bid based on alleged improprieties in the solicitation. As the court has learned, 56 out of 57 bidders in fact received contracts. The court is persuaded that Old Dominion has demonstrated that it would have had a substantial chance, or at least not an "insubstantial" chance, *see ITAC,* 316 F.3d at 1319, of receiving an award if not discouraged by the alleged improprieties. Because Old Dominion has shown that " 'it could compete for the contract' if the bid process were made competitive," *see Myers,* 275 F.3d at 1370; *Impresa,* 238 F.3d at 1334, the court is satisfied that plaintiffs have established that Old Dominion has the requisite standing to bring this bid protest.

## C. Whether Plaintiffs' Protest is Timely

██ Defendant urges the court to apply the well-established General Accounting Office (GAO) bid protest rule, 4 C.F.R. § 21.2(a)(1), requiring protests that are based upon alleged improprieties in a solicitation which are apparent prior to the bid opening or the time set for receipt of initial proposals to be filed prior to that time. Def's Mot. at 14. Invoking that timeliness rule, defendant argues that plaintiffs' bid protest is untimely because they are challenging the terms of a solicitation after both the closing date for receipt of proposals and after the date of contract award. *Id.* at 14–16.

The statute granting this court's jurisdiction to entertain bid protests does not address the time within which a bid protest must be filed. *See* 28 U.S.C. § 1491(b). Nevertheless, this court has adopted, "in appropriate circumstances," the GAO bid protest rule.[4] *See N.C. Div. of Servs. For Blind v. United States,* 53 Fed.Cl. at 165 (citing *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358, *aff'd,* 39 F.3d 1198, 1994 WL 572795 (Fed.Cir.1994) (Table)) (declining to accept GAO bid protest regulations as controlling all cases concerning the timeliness of an objection to solicitation terms, but accepting the "utility of the GAO rule in the bid protest arena") (citing *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 789 (1991) (favoring the timeliness regulations of GAO for bid protests)). *See also MVM, Inc. v. United States,* 46 Fed.Cl. 126, 130 (2000) (citing *Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 145 (1997), *aff'd,* 173 F.3d 435, 1998 WL 741008 (Fed.Cir.1998) (Table) and *Aerolease,* 31 Fed.Cl. at 358, for the proposition that "challenges to the facial terms of the solicitation [are] to be made before the award of the contract").

Plaintiffs argue against the application of the GAO rule here on the ground that the GAO rule has been applied by this court only when a complainant has submitted an offer "without first using available avenues for redress to challenge [the solicitation's] provisions." Pls.' Opp. at 13 (citing *N.C. Div. of Servs. for the Blind,* 53 Fed.Cl. at 165, and *Aerolease,* 31 Fed.Cl. at 358). Plaintiffs contend that "they acted expeditiously to challenge the recognized improprieties in the solicitation." Pls.' Opp. at 14. The court must decide whether this case presents one of the "appropriate circumstances," *see N.C. Div. of Servs. for the Blind,* 53 Fed.Cl. at 165, for the application of the GAO bid protest rule.

In this case, plaintiffs challenged the terms of the solicitation prior to the contract award by jointly filing a protest with MTMC before

4. Although GAO decisions are not binding on this court, the court does find guidance in the Comptroller General decisions "in recognition of GAO's expertise and role in the resolution of contested procurement decisions." *N.C. Div. of Servs. For Blind,* 53 Fed.Cl. at 166 n. 13 (citing

*Bean Dredging Corp. v. United States,* 22 Cl.Ct. at 522 (citing *Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989)) and *Howell Constr., Inc. v. United States,* 12 Cl.Ct. 450, 452 (1987)).

the originally scheduled due date for proposals, by filing a joint protest with GAO ten days after MTMC's denial of plaintiffs' protest, and by jointly filing a lawsuit in district court within three weeks of GAO's denial of the protest and three days before the contract award.[5] *See* Compl. ¶¶ 16, 20–24, Pls.' Opp. at 14. Moreover, upon determining that the district court was not the proper court in which to file their protest, plaintiffs voluntarily dismissed that action and filed suit in this court for the stated reason that "it seemed the most expeditious means of moving the case forward and resolving the matter." Pls.' Opp. at 6. *But see* 28 U.S.C. § 1631 (authorizing the transfer of an action, if it is in the interest of justice, from a court lacking jurisdiction to any other such court in which the action could have been brought at the time it was filed for such action to proceed as if it had been filed originally in the court to which it is transferred).

It is the view of the court, however, that the GAO timeliness rule is applicable in this case. MTMC issued the solicitation on June 21, 2002. Compl. ¶ 11; A.R. at 245. Challenging the terms of the solicitation rather than the evaluation of their proposals in this protest, *see* Compl. ¶ 14; Tr. at 38, plaintiffs filed their agency protest, their GAO protest, their erroneously-filed district court pre-award protest, and this post-award action on the same legal grounds. *See* Compl. ¶¶ 17, 25–74; A.R. at 25–67. Plaintiffs seek injunctive relief, *see* Compl. at pp. 12–13, and concede that, as early as November 8, 2002, the date of GAO's denial of their protest, they were aware "that the [only] way to get this contract stopped" was to file suit in this court. Tr. at 69–70. Yet, pending client

authorization to proceed, suit was not filed in this court until December 10, 2002, four days after awards were made. *Id.* at 70; Compl. ¶ 24.

If plaintiffs' protest were nonetheless deemed timely, the court considers the merits of plaintiffs' protest, specifically, the alleged improprieties by defendant in handling the procurement.

### D. Whether MTMC's Handling of the Procurement was Reasonable and in Accordance with the Law

### 1. Whether MTMC Issued Amendment 12 in Violation of the FAR

 MTMC issued Amendment 12 on September 26, 2002. Def.'s Facts ¶ 21. Amendment 12 removed from the solicitation all references to the commodity item numbers, commodity descriptions, and packaging specifications of the National Motor Freight Classification (NMFC).[6] A.R. at 254, 376A. On October 19, 2002, the contracting officer requested that offerors submit their final proposal revisions on October 24, 2002. Def.'s Facts ¶ 26.

Plaintiffs complain that, in formulating their bids and, in particular, their prices, they had relied on the NMFC packaging specifications in the solicitation that were removed by Amendment 12.[7] Pls.' Opp. at 7. Plaintiffs allege that Amendment 12 to the solicitation was issued in violation of law because the amendment altered a material term of the solicitation after the bid submission date. Compl. ¶¶ 29–31; Pls.' Opp. at 14–18; Plaintiffs' Reply in Support of Cross–

---

5. All of the plaintiffs protested the solicitation prior to the agency's contract awards by jointly submitting an agency level protest on August 2, 2002 and by filing a protest in the district court on December 3, 2002. Plaintiffs' Statement of Facts Accompanying their Cross–Motion for Summary Judgment (Pls.' Facts) at ¶¶ 15, 26–27.

6. The National Motor Freight Traffic Association, Inc. (NMFTA) publishes the National Motor Freight Classification (NMFC). Pls.' Opp. at 14. Plaintiffs in this case are all NMFTA members who participate in the NMFC. *Id.* at 15.

7. Plaintiffs argue that the packaging specifications of the NMFC "are essential to the safe

transportation of goods," Pls.' Opp. at 15, and that, "[i]n the absence of any packaging guidelines, freight is more likely to be poorly packaged and damaged during the moving process," potentially resulting in increased cargo damage claims against carriers. *Id.* at 16. Plaintiffs assert that these packaging provisions apply to the contracts, specifically, the voluntary and GT tenders, under which plaintiffs presently handle DOD traffic. *Id.* at 15. Plaintiffs state that among the considerations influencing their pricing decisions in preparing their proposals "was the understanding that all freight covered by the [challenged] solicitation would be safely packaged in accordance with NMFC specifications." *Id.*

Motion for Summary Judgment Upon the Administrative Record (Pls.' Reply) at 5–6. As authority for that argument, plaintiffs cite *Christolow Fire Prot. Sys.*, B–257,784, B–286,585, Jan. 12, 2001, 2001 CPD ¶ 13, 2001 WL 38745, and *G.R. Sponaugle & Sons, Inc.*, B–257,784, Nov. 7, 1994, 94–2 CPD ¶ 178, 1994 WL 635161, for the proposition that the reference to NMFC in the solicitation was a material term because "it had more than a negligible impact on price, quantity, quality, or delivery." *See* Pls.' Opp. at 16. Plaintiffs assert that they had no opportunity to revise their proposals in response to Amendment 12. *See* Plaintiffs' Supplemental Authorities Relating to Changes to Proposal Following Discussions in Negotiated Procurement (Pls.' Supp. Auth. Re: Proposal Changes) at 1–2.

Defendant denies violating FAR § 14.208, not because the removal of the NMFC references was not a material change, but because the final proposal revisions were not due until October 24, 2002, twenty-eight days after the issuance of Amendment 12.[8] *See* Def.'s Mot. at 17. Defendant argues that plaintiffs cannot establish any prejudice as a result of Amendment 12 because all bidders had an opportunity to amend the technical and pricing aspects of their proposals after the issuance of Amendment 12. *Id.* In support of its position, defendant points to the October 19, 2002 letter from the contracting officer to the offerors, which states in pertinent part:

> This letter is to inform you that all discussions have been concluded and that, in accordance with FAR 15.307, you are being afforded the opportunity to submit a "Final Proposal Revision." Although not prohibited, the government does not envision any changes to your technical proposal. Any changes to your pricing shall be submitted on the Schedule of Services pricing

sheets, Attachment II of the solicitation, as posted on the MTMC homepage.

A.R. at 538.

FAR § 15.307, entitled "Proposal revisions," provides:

> (a) If an offeror[']s proposal is eliminated or otherwise removed from the competitive range, no further revisions to that offeror's proposal shall be accepted or considered.
>
> (b) The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations. At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision. The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions. Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

FAR § 15.307.

Relying primarily on the second sentence of FAR § 15.307(b), defendant asserts that the proposal revisions contemplated by FAR § 15.307(b) are not limited. Defendant's Brief regarding Federal Acquisition Regulation Section 15.307(b) (Def.'s Br. Re: FAR 15.307(b)) at 5–6. *See* Tr. at 62–73.

Plaintiffs argue, however, that they interpreted the October 19, 2002 letter to allow them "only to make revisions to their bids to reflect 'discussions' that they had with the contracting officer." Pls.' Supp. Auth. Re: Proposal Changes at 1. Plaintiffs rely on the first sentence of FAR § 15.307(b) for their view that the scope of permissible revisions was so limited. *See* Tr. at 62–73. Plaintiffs contend that because none of their discussions with the contracting officer included

---

8. FAR § 14.208 provides:
 If it becomes necessary to make changes in quantity, specifications, delivery schedules, opening dates, etc., or to correct a defective or ambiguous invitation, such changes shall be accomplished by amendment of the invitation for bids .... Amendments shall be sent, before the time for bid opening, to everyone to whom invitations have been furnished and shall be displayed in the bid room.

FAR § 14.208(a). As stated in its briefing, defendant assumes that plaintiff intends to cite FAR § 15.206 rather than FAR § 14.208. Def.'s Mot. at 16 n. 3. Defendant notes that FAR § 14.208 is not the applicable provision for the solicitation. *Id.* Rather, FAR § 15.206, the corollary provision to FAR § 14.208, applies to this negotiated procurement. *Id.*

mention of Amendment 12 or any of the other issues raised by plaintiffs in their protests, they "could not revise their [final] proposals to reflect those items." Pls.' Supp. Auth. Re: Proposal Changes at 2.

The first two sentences of FAR § 15.307(b) appear to the court to address two different types of revisions. The first sentence enables a contracting officer to focus or limit the scope of an offeror's revisions by "request[ing] ... proposal revisions to clarify and document understandings reached during negotiations." FAR § 15.307(b). The language of the second sentence of the provision, however, lacks any restrictions. Rather, it requires that each offeror remaining in the competitive range have "an opportunity to submit a final proposal revision." *Id.* The second sentence does not appear to limit the scope of that final proposal revision. If the second sentence contemplated the same limitations as the first sentence, as plaintiffs argue, it would be surplusage. An interpretation rendering a sentence surplusage is not favored by the rules of statutory construction. *See* 2A Norman J. Singer, *Sutherland's Rules of Statutory Construction* § 46:06, at 101–194 (6th ed.2000).

Defendant has also argued, as support for its reading of FAR § 15.307(b), the language of the FAR provision governing final proposal revisions in effect prior to the FAR Part 15 rewrite in 1997, *see* 62 Fed.Reg. 51230 (Sept. 30, 1997), and the regulation drafters' commentary on the changes effected by that rewrite. *See* 62 Fed.Reg. 51224–25.

The FAR provision governing final proposal revisions prior to the FAR Part 15 rewrite was FAR § 15.611. *See* FAR § 15.611(1996). It is undisputed that pursuant to FAR § 15.611 (1996) and prior to the promulgation of FAR § 15.307(b), offerors were permitted to revise all aspects of their proposals after discussions, including portions of their proposals not addressed in discussions. *See, e.g., AVIATE L.L.C.,* B–275,058, Apr. 14, 1997, 97–1 CPD ¶ 162, 1997 WL 224003; *Krueger Int'l, Inc.,* B–260,953, Oct. 4, 1995, 96–1 CPD ¶ 235, 1995 WL 861604; *Serv–Air, Inc.,* B–258243, Mar. 3, 1995, 95–1 CPD ¶ 125, 1995 WL 90181; *BNF Techs., Inc.,* B–254,953, Dec. 22, 1994, 94–2 CPD ¶ 258, 1994

WL 716846; *Sys. Planning Corp.,* B–244,697, June 15, 1992, 92–1 CPD ¶ 516, 1992 WL 142553; *Am. Nucleonics Corp.,* B–193,546, Mar. 22, 1979, 79–1 CPD ¶ 197, 1979 WL 12775.

The drafters' commentary on the FAR 15 rewrite describing the changes incorporated into FAR Part 15 included the following items potentially relating to discussions:

— Increasing the scope of discussions;

— Requiring that all adverse past performance information be brought to the offeror's attention during discussions, if the offeror is placed in the competitive range;
.... [and]

— Streamlining the post-competitive range process by enhancing the ability of the parties to communicate and document understandings reached during discussions.

62 Fed.Reg. 51224–25. Of particular relevance to this dispute is the last item, "[s]treamlining the post-competitive range process by enhancing the ability of the parties to ... document understandings," the concept which appears in the first sentence of FAR § 15.307(b). That provision does not appear to the court to be in any way inconsistent with the continuing vitality of a broad permission to amend, the concept which appears to be continued in the second sentence of FAR § 15.307(b). And if the concept of a broad permission to amend in a final proposal revision were continued from the prior regulation, one would not expect it to be listed among the changes. Indeed, only if the concept of broad permission to amend had been abandoned or limited, would one expect to find that development noted.

GAO has squarely addressed the issue whether offerors, when submitting a final proposal pursuant to FAR § 15.307(b), may revise their proposals without limitation or are restricted to revising only those portions of the proposals that were the subject of agency discussions, holding that offerors responding to discussions may revise aspects of their proposals beyond the scope of the discussions absent an agency's decision, in appropriate circumstances, to limit the revisions offerors could make after the conduct

of discussions. *See Rel–Tek Sys. & Design, Inc.,* B–280,463.7, Jul. 1, 1999, 99–2 CPD ¶ 1, 1999 WL 485035.

Both the drafting history of FAR § 15.307(b) and its subsequent interpretation by GAO are consistent with what the court believes is the proper interpretation of the plain language of the regulation. In this case, the correspondence from the contracting officer inviting final proposal revisions did not limit the scope of changes to be made. The October 19, 2002 letter gave specific instructions for submitting "[a]ny changes to your pricing." A.R. at 538 (emphasis supplied). Moreover, the contracting officer informed the offers that although technical changes were not "envision[ed]," such changes were "not prohibited." *Id.* Because plaintiffs were afforded an opportunity to revise their proposals after the issuance of Amendment 12, the court finds no violation of law in the agency's issuance of Amendment 12.

2. Whether MTMC's Fixed Prices for Accessorial Services Violated the FAR

▮ Plaintiffs complain that "MTMC fixed the prices for all anticipated accessorial services ... to be provided by carriers for [the term] of the contract." Compl. ¶ 33; Pls.' Opp. at 18. The accessorial price schedule set forth in the solicitation includes charges and/or rates for detention of the carriers' vehicles, pickup and delivery outside of normal business hours or on non-business days, reconsignment, diversion, or redelivery of shipments, storage of freight, vehicles furnished but not used, additional cargo liability insurance, and numerous other services other than the line-haul. A.R. at 225; *see* Pls.' Opp. at 19. The solicitation allows "[c]ompetitive pricing and rate adjustments ... only for line[-]haul rates." Pls.' Opp. at 19; Compl. ¶ 33. Plaintiffs contend that by establishing the prices for accessorial services, MTMC violated FAR § 47.207–6(b), which requires an agency to allow offerors on transportation contracts to offer rates for specific transportation services. Compl.

¶¶ 36–39; Pls.' Opp. at 21. *See also* FAR § 47.207–6(b).

In its motion for summary judgment, defendant argues that FAR § 47.207–6(b) does not apply to this procurement because this procurement is a commercial items procurement conducted under FAR Part 12 and governed by the provisions therein. Def.'s Mot. at 17 (quoting FAR § 12.301(d)) ("Notwithstanding prescriptions contained elsewhere in the FAR, when acquiring commercial items, contracting officers shall be required to use only those provisions and clauses prescribed in this part."). It is undisputed that this procurement was conducted under FAR Part 12. The court agrees that defendant was not required to follow FAR § 47.207–6(b) in this procurement.

When plaintiffs protested the solicitation to the agency on August 2, 2002, they asserted, invoking FAR Subpart 47.2, that it is the right of the offerors, not the governmental agency, to determine and establish the rates or prices for transportation-related services offered to the agency. A.R. at 50–55. MTMC responded on August 14, 2002 by issuing Amendment 6, an amended schedule of prices for accessorial services.[9] A.R. at 365–68.

Defendant contends that its pricing for accessorial services is rationally based on "20 years of establishing accessorial charges under the GT [Guaranteed Traffic Tenders] program" and is consistent with commercial practices based on MTMC's discussions about accessorials conducted between industry and government representatives. Def.'s Mot. at 18; *see* Defendant's Reply in Support of its Motion for Summary Judgment Upon the Administrative Record (Def.'s Reply) at 6. Defendant points out that it provided plaintiffs with spreadsheets to insert their prices for line-haul transportation services, Def.'s Mot. at 18 (citing A.R. at 388–89), and states that the offerors could have inserted into those line-haul rates the difference between the agency-established accessorial rates and the charges that the offerors would have proposed. *Id.* Defendant argues that

---

9. In the new schedule, MTMC separated the pricing of accessorials for truckload and less-than-truckload carriers and adjusted certain specific charges, increasing some and decreasing others. A.R. at 336; Def.'s Mot. at 5; Pls.' Opp. at 19.

this particular count of plaintiffs' complaint must be dismissed because the accessorial pricing system of the solicitation has a rational basis for meeting the agency's needs and is not unduly restrictive. *Id.* (citing *XTRA Lease, Inc.,* 50 Fed.Cl. at 624.). *See* Def.'s Reply at 6.

The solicitation defines the term "line-haul" as "[t]ransportation of freight over contractor routes from point of origin to destination, excluding local pickup, delivery, and switching service." A.R. at 143. An accessorial service is defined as a "service performed by the contractor in addition to the line-haul." A.R. at 139. Based on this definitional distinction in the solicitation, plaintiffs argue that they could not alter their line-haul transportation bid to include unrelated accessorial services. Pls.' Opp. at 23. Plaintiffs conceded at oral argument, however, that nothing in the solicitation or in the case law would have, as a matter of law, prohibited plaintiffs from adjusting their line-haul rates to cover the risks associated with providing accessorial services at the agency's fixed rates. Tr. at 22–24. Rather, plaintiffs assert that such an adjustment would have made their offers non-competitive. *Id.* at 24–25.

■■■ Defendant has explained that in making its decision to set the accessorial rates for this solicitation, "several integrated process team ... sessions with industry and Government representatives" were held. Def.'s Reply at 6 (citing A.R. at 23). The case law is clear that "procurement officials are entitled to broad discretion ... in the application of procurement regulations, particularly in those instances where, as here, a negotiated procurement is at issue." *Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 597 (1997). The court cannot find that defendant's decision-making process in fixing the prices for accessorial services lacked a rational or reasonable basis. *See id.* Nor have plaintiffs established that the procurement procedure involved a clear and

prejudicial violation of applicable statutes or regulations. *Id.*

### 3. Whether the Solicitation Improperly Required Offerors to Deviate from Commercial Practice

■■■ Plaintiffs allege that the particular terms and conditions of the solicitation effectively require offerors to provide certain accessorial services at no cost to the agency. *See* Compl. ¶¶ 42–55; Pls.' Opp. at 24; Pls.' Reply at 8. For example, plaintiffs point out that the solicitation requires: (1) without charge for other than security purposes, a contractor must tarp a shipment, A.R. at 258; (2) upon request and without additional charge, a contractor must, at least twenty-four hours prior to the vehicle's arrival, pre-arrange schedules with the designated shipper or receiver for loading or unloading, *id.* at 267; (3) upon request and without additional charge, a contractor must notify, by telephone, a receiver of a vehicle's arrival prior to delivery, *id.;* and (4) a contractor may not assess storage charges sooner than twenty-four hours after contacting the receiver for redelivery instructions. *Id.* at 268; Pls.' Opp. at 24. Plaintiffs contend that MTMC's specifications restrict a carrier's ability to assess storage and redelivery charges when, due to the shortened operating hours of many defense installations,[10] the carriers must retain possession of and redeliver their shipments. *Id.* at 25–26. Plaintiffs argue that such practice is inconsistent with standard commercial practice. Pls.' Opp. at 26 (citing *Detention of Motor Vehicles—Nationwide,* 126 M.C.C. 803, 817 (1977)).

Plaintiffs also argue that the carrier detention rules in the solicitation are inconsistent with standard commercial practice. Pls.' Opp. at 24–25. Plaintiffs complain that paragraph C.4.9 of the solicitation which discusses the detention of vehicles (with or without power units) requires carriers to wait with vehicles or leave vehicles with DOD shippers for extended time periods without compensa-

---

10. The Solicitation states that "[s]hipping operations are normally conducted Monday to Friday, excluding federal holidays, from 8 a.m. to 3 p.m....." A.R. at 251. But plaintiffs contend that many facilities have reduced the hours or

days for shipping operations from the standard schedule set forth in the Solicitation. Pls.' Opp. at 25 n. 3. Defendant does not dispute this contention.

tion. Compl. ¶ 44. Plaintiff observes that "MTMC's Schedule of Services indicates that the estimated quantities of [accessorial] services per year for detention, redelivery, and storage are zero." Pls.' Opp. at 27 (citing A.R. at 225).

FAR § 12.302(c) prohibits a contracting officer from tailoring a contract clause or including additional terms or conditions in a solicitation or contract for commercial items "in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures." The regulatory provision states that:

> The request for waiver must describe the customary commercial practice found in the marketplace, support the need to include a term or condition that is inconsistent with that practice and include a determination that use of the customary commercial practice is inconsistent with the needs of the Government. A waiver may be requested for an individual or class of contracts for that specific item.

FAR § 12.302(c). FAR § 12.302 further provides that any tailoring of a clause in a solicitation or contract "shall be by addenda to the solicitation and[/or] contract." FAR § 12.302(d).

Defendant argues that "it is within an agency's discretion to solicit a proposed contract which maximizes risks upon the contractor and minimizes administrative burdens on the Government." *See* Def.'s Mot. at 19 (citing *Sea–Land Servs., Inc.*, B–278404.2, Feb. 9, 1998, 98–1 CPD ¶ 47 at *14, 1998 WL 53923); Def.'s Reply at 7. Acknowledging that the solicitation shifts the risk for these accessorial services to the contractor, defendant points to the statement by the contracting officer explaining:

> The conditions we have established in this solicitation for payment of detention and similar charges are intended to establish uniform procedures across the Department of Defense.... Allowing the protesters to charge for detention services as they sug-

gest would significantly increase the costs and risks to DOD for this service. Because detention is an event that occurs at the origin and destination locations throughout the United States, MTMC has no visibility over it to prevent it or to reduce it when it does occur. Given the nature of our operations, we believe all contractors can factor that risk into their line[-]haul rates.

A.R. at 24.

Although defendant disputes the factual predicate for plaintiffs' argument—that the fixed rates for accessorial services under the solicitation are inconsistent with customary commercial practice,[11] A.R. at 35–36; Def.'s Mot. at 18, defendant nonetheless executed a waiver. A.R. at 385–87. With respect to the detention provisions, defendant concedes that the solicitation is inconsistent with customary commercial practice, stating:

> [T]he decentralized nature of DOD's transportation operations, the different security requirements applicable at different military installations from time to time, the different operating hours at the installations, and the fluctuating transportation requirements across the nation, among others, make it impossible for DOD to operate under detention rules designed for commercial customers that have different operational requirements.

A.R. at 386–87.

The closing date for offers under the solicitation was August 12, 2002. A.R. at 353. MTMC issued a "Waiver of Customary Commercial Practices" for the solicitation on September 13, 2002. A.R. at 385–87; Def.'s Facts ¶ 25. Plaintiffs contend that, in contravention of the FAR, MTMC issued the waiver after the bids were submitted to avail itself of the noted deviations from commercial practice. Pls.' Opp. at 27. Plaintiffs assert that such waiver must be obtained before the issuance of the solicitation. *Id.* (citing FAR § 12.302(d)).

---

11. Defendant reasons that, because "MTMC has been establishing the rates for accessorial charges for many years ... this practice is essentially a commercial practice in government con-

tracts." A.R. at 386. Defendant further notes that plaintiffs have declined to produce evidence of any representative commercial contracts to support their allegations. *See* A.R. at 34.

Several decisions of the Comptroller General provide guidance on the issues raised in this protest concerning the waiver issued by MTMC. In *Aalco Forwarding, Inc.*, B–277,241, B–277,241.8, B–277,241.9, Oct. 21, 1997, 97–2 CPD ¶ 110, 1997 WL 649182, the Comptroller General considered protests challenging, among other matters, the timing of MTMC's issuance of a waiver of customary commercial practice in connection with a solicitation for moving services. MTMC issued the waiver during the course of the protest. *Id.* at *10. Satisfied that the request for waiver complied with the requirements of FAR § 12.302(c), the Comptroller General found "no[ ] . . . prohibition in the regulation against the granting of waiver following the issuance of the RFP, particularly where . . . the RFP . . . will allow potential offerors to submit new or revised proposals." *Id.* at *12; *accord Crescent Helicopters*, B–284,706, B–284,707, B–284,734, B–284,735, May 30, 2000, 2000 CPD ¶ 90 at *4, 2000 WL 706977.

In deciding whether the solicitation requirements asserted to be inconsistent with customary commercial practices require a waiver, the Comptroller General has considered whether the challenged terms of a solicitation are "individually or in total of such a nature as to transform the type of services sought [in the solicitation] to something other than a commercial item." *Aalco Forwarding, Inc.*, 97–2 CPD ¶ 110 at *11. In making this determination, the Comptroller General may examine commercial contracts for similar provisions. *See Crescent Helicopters*, B–284,706, B–284,707, B–284,734, B–284,735, 2000 CPD ¶ 90 at *3; *Smelkinson Sysco Food Servs.*, B–281,631, Mar. 15, 1999, 99–1 CPD ¶ 57, *4, 1999 WL 140173 (absent meaningful market research showing RFP requirement to be consistent with customary commercial practice and given apparent agency concession that no such customary commercial practice correlative to RFP requirement existed, agency's failure to obtain a waiver found improper).

The parties in this case disagree about the whether certain of the terms of the solicitation are inconsistent with customary commercial practice. The court need not decide that matter, however, because it is the view of the court that the agency's issuance of the waiver operates to exempt the solicitation from the customary commercial practices for the established accessorial rates and the detention provisions set forth in the solicitation. Although the agency issued the waiver on September 13, 2002, after the date for the submission of bids, offerors had until October 24, 2002, to submit final proposal revisions. Applying the reasoning informing the Comptroller General decisions, the court finds that notwithstanding the date on which the agency issued the waiver, the offerors in this circumstance had an opportunity to submit final proposal revisions after the waiver's issuance. *See Aalco Forwarding, Inc.*, 97–2 CPD ¶ 110 at *11–12; *Crescent Helicopters*, 2000 CPD ¶ 90 at *4.

Consistent with the agency's articulated goal of establishing "uniform procedures" across DOD "for payment of detention and similar charges," A.R. at 24, the court finds that defendant has acted within its "discretion to solicit a proposed contract which maximizes risks on the contractor and minimizes administrative burdens on the government." *Sea–Land Servs., Inc.*, B–278,404.2, Feb. 9, 1998, 98–1 CPD ¶ 47 at *10, 1998 WL 53923. Because plaintiffs have failed to show that the agency's waiver is legally defective, the court does not find that the solicitation improperly required offerors to deviate from customary commercial practices.

### 4. Whether MTMC's Minimum Quantity of Freight per Lane Violated the FAR

MTMC issued the solicitation for multiple indefinite delivery/indefinite quantity (ID/IQ) contracts to two or more carriers for each lane. A.R. at 248, 322–323; Def.'s Facts ¶¶ 6, 8–9. Originally, the solicitation contemplated a total dollar amount ranging from a minimum of $25 million to a maximum of $300 million for the contract awards. A.R. at 248. The solicitation provided that the "minimum amount for individual contract awards to specific contractors, will be determined at the time of award when the total number of contracts to be awarded is known." *Id.* No minimums and maximums were specified for awards in individual lanes. *See* A.R. at 445. Among the other grounds on which plaintiffs

protested to the agency on August 2, 2002, plaintiffs challenged the absence of stated minimums as required by FAR § 16.504(a)(1). *See* A.R. at 187–196. In response, MTMC issued Amendment 5 to the solicitation on August 8, 2002, establishing minimum and maximum quantities for all lanes. A.R. at 357–362.

 The FAR provides that an agency may use an ID/IQ contract "when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require during the contract period. . . ." FAR § 16.504(b). An ID/IQ contract requires an agency to order and the contractor to furnish at least a stated minimum quantity of supplies or services and, if ordered, the contractor to furnish any additional quantities, not to exceed a stated maximum. FAR § 16.504(a)(1). An agency may exercise its discretion in setting the stated minimums in an ID/IQ contract provided that the estimates are established in good faith or are based upon the best information available and accurately represent the agency's anticipated needs. *Sea–Land Serv., Inc.*, B–278,-404.2, 98–1 CPD ¶ 47 at *8, 1998 WL 53923 (citing *Howard Johnson*, B–260,080, May 24, 1995, 95–1 CPD ¶ 259 at *3, 1995 WL 317618); *Int'l Tech. Corp.*, B–233,742.2, May 24, 1989, 89–1 CPD ¶ 497 at *3–*4, 1989 WL 240734.

 An agency's discretion in setting minimum quantities is not unlimited. For example, a minimum is not acceptable in a situation where the agency "has simply declined to try to establish a more exact level." *Sea–Land Serv., Inc.*, B–278,404.2, 98–1 CPD ¶ 47 at *9. To satisfy the requirement of the FAR, small minimum quantities "must be more than a nominal quantity." FAR § 16.504(a)(2); *see also Travel Centre v. Barram*, 236 F.3d 1316, 1319 (Fed.Cir.2001); *J. Cooper & Assocs., Inc. v. United States*, 53 Fed.Cl. 8, 17 (2002); *Sea–Land Serv., Inc.*, 98–1 CPD ¶ 47; *see, e.g., Sunbelt Props., Inc.*, B–249,307, Oct. 30, 1992, 92–2 CPD ¶ 309, 1992 WL 320726 (agency changed minimum from 1 out of 206 properties to be managed by successful bidder to more realistic minimum of 50); *Sletager, Inc.*, B–244,-710, Nov. 13, 1991, 91–2 CPD ¶ 452, 1991 WL 251280 (spread between $5,000 and $500,000 in minimum and maximum amounts of work to be ordered meant that minimum could not be more than nominal if maximum was realistic).

 Plaintiffs complain that, in violation of the FAR, the minimum quantities established by MTMC were "nominal." Compl. ¶ 62; Pls.' Opp. at 29–33. Plaintiffs observe that the stated minimums are five percent of the estimated total number of shipments and four percent of the stated maximum shipments for the lanes. Pls.' Opp. at 30 (citing A.R. at 357–362, 390). Perhaps inadvertently conceding the point, plaintiffs argue that defendant's use of such fixed minimums shows "an attempt to circumvent the [FAR] requirement through *literal compliance* with the regulation, instead of determining a realistic amount of traffic that DOD shippers were fairly certain to order." Pls.' Opp. at 30 (emphasis added).

Defendant argues that "the stated minimum is the quantity that MTMC is fairly certain to order." Def.'s Mot. at 20. Defendant asserts that the FAR does not require that a minimal order be a large quantity. *Id.* Rather, defendant contends, an ID/IQ solicitation must lead to binding contracts. *Id.* (citing *Appeal of Horton*, 82–2 BCA ¶ 15,967 at n. 2, 1982 WL 7875 (1982)). Defendant points out that, to be a binding contract under the FAR, the minimum quantity must be more than a nominal amount. Def.'s Mot. at 20 (citing FAR § 16.504(a)(2) and *Carr's Wild Horses*, B–285,833, Oct. 3, 2000, 2000 CPD ¶ 210, 2000 WL 1474096 ("[A]n IDIQ contract is binding so long as the buyer agrees to purchase from the seller at least a guaranteed minimum quantity of good and services; the stated minimum quantity forms the consideration of the contract.")).

Defendant explains that the number of awards for a given lane depended upon the number of offers received for that lane, the estimated quantities for the particular lane, and the quality of the offers received. Def.'s Mot. at 20 (citing A.R. at 10–12). Defendant adds that it was uncertain about the minimum quantities because this was a new pro-

curement, and the traffic award process was new for both the Department of Defense shippers and the contractors. *Id.* Defendant did not know how many awards and how many shipments each contractor would obtain. *Id.* Because the number of contract awards was uncertain, defendant used a minimum of five percent of the number of estimated total shipments as a conservative number per contractor, reflecting the amount MTMC is fairly certain to offer to each contractor. *Id.* (citing A.R. at 21–22). Defendant notes that FAR § 16.504(c) instructs:

> [C]ontracting officers may use an indefinite-quantity contract when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require during the contract period, and *it is inadvisable for the Government to commit itself for more than a minimum quantity.*

*Id.* (emphasis added by defendant).

Plaintiffs argue that defendant's explanation for its use of the stated minimums is not rational. Pls.' Opp. at 31. Plaintiffs contend that, although the regional form of the solicitation is new, MTMC has decades of experience with GT tender awards that have met DOD's transportation needs. *Id.* Plaintiffs further contend that defendant did not exercise the requisite good faith in establishing the stated minimums because it did not use available historical data to "establish[ ] minimums that more accurately represented the transportation needs of DOD shippers." Pls.' Reply at 12; *see* Pls.' Opp. at 31–32.

Defendant has stated and plaintiffs do not disagree that the procurement is new. In contrast to the GT program, the solicitation permitted both motor carriers and non-carriers [12] to compete directly for awards. *See* A.R. at 26; Pls.' Opp. at 33; Pls.' Reply at 12. Moreover, it is undisputed that the regional structure of the procurement is new. Because offerors were not required to bid on all the regions or on all of the lanes of traffic, *see* A.R. at 27, defendant did not know how many awards and how many shipments each contractor would obtain under the new pro-

curement. One of the agency's articulated goals of this procurement "is to gather . . . data for future procurements and for overall transportation management." A.R. at 27. Based on the agency's uncertainty, defendant declined "to commit itself for more than a minimum quantity." *See* FAR § 16.504(c). Defendant also argues that it "wanted to preserve flexibility based upon contractor performance." Def.'s Mot. at 20–21. Defendant contends that, if an awardee failed to provide quality services, the agency's obligation to tender shipments to that contractor would end after the minimum quantities had been satisfied. *Id.* at 21.

Defendant has given several reasonable explanations related to the agency's procurement needs for the minimum it established. In this circumstance, the court is not persuaded that defendant exercised its discretion irrationally, arbitrarily, or in bad faith in establishing the stated minimums for the procurement.

5. Whether MTMC Violated the FAR by Adopting a Regional Structure for the Procurement

██ The solicitation divides the continental United States into nine origin and six destination regions. Def.'s Facts ¶ 7. The solicitation contains multiple lanes of traffic from each origin region to each destination region. Def.'s Facts ¶ 9. Individual lanes were represented by contract line items in the schedule of prices, contained in Attachment II of the solicitation. Def.'s Facts ¶ 16.

Plaintiffs complain that each region "may combine a high volume depot with small, low volume facilities located hundreds of miles away" and that the provision of transportation services "would ordinarily be priced differently by the carriers" based on "the differences in volume and nature of the facilities included in certain large origin/destination lanes." Compl. ¶¶ 65, 67. Plaintiffs argue that "MTMC's bundling of facilities into large regions prevents bidders from offering MTMC the lower pricing available in the past for routes that are now grouped with more

---

12. Non-carriers include brokers, third party logistics companies, and freight forwarders. *See* A.R. at 26. Such firms "do not necessarily own trucks or other transportation assets." *Id.*

costly routes into a single lane." Compl. ¶ 68. Asserting that the MTMC's bundling of facilities into large regions reduces competition by eliminating bidders who are not large enough to handle all of the freight included in a lane, plaintiffs contend that the regional structure of the solicitation violates the "full and open competition" requirement of the FAR. Compl. ¶¶ 70, 72. Despite the invocation of "bundling," plaintiffs do not claim that they themselves have been injured by the size of the regions determined by defendant here. The Federal Circuit has stated in *Myers* that prejudice or injury is an element of standing. 275 F.3d at 1370; *see also ITAC*, 316 F.3d at 1319. Absent an alleged injury, plaintiffs lack standing to assert this particular claim. Even if plaintiffs could cure this jurisdictional defect and show injury, plaintiffs have not shown that defendant's choice of regional structure was in violation of law.[13]

Because plaintiffs have failed to prove the merits of their claims, their demand for injunctive relief, *see* Compl. at pp. 12–13, must be denied. *See CESC Plaza Ltd. P'ship v. United States*, 52 Fed.Cl. 91, 101 (2002) ("Injunctive relief is inappropriate here because

the plaintiffs did not prove the merits of their claim.").

### III. Conclusion

For the foregoing reasons, defendant's motion is GRANTED. Plaintiffs' motion is DENIED. The Clerk of the Court shall enter judgment dismissing the complaint without prejudice as to Overnight Transportation Company, Roadway Express, Inc., and Yellow Transportation, Inc. and dismissing the complaint with prejudice as to ABF Freight System, Inc. and Old Dominion Freight Line, Inc.

IT IS SO ORDERED.

---

**13.** Defendant has explained both initially in the agency level protest and again here that it decided to use this regional structure after examining its business requirements, its statutory requirements, and industry norms. Def.'s Mot. at 21–22; Def.'s Reply at 9 (citing A.R. at 22–23). Defendant further asserts that, after meeting with industry representatives and considering the many shipping installations in the United States, its decision to regionalize the contract was consistent with the agency's "desire to enhance competition, and ... to simplify the evaluation of offers[] and the administration of subsequent contracts." Def.'s Mot. at 21–22; Def.'s Reply at 9 (citing A.R. at 22–23). Moreover, defendant notes that "it is a common industry practice for motor carriers to submit rates under a region-to-region concept" and that "this form of regionalization is ... [a] common practice in the contracts that carriers routinely negotiate with large corporate customers." Def.'s Mot. at 22.

The law is well-settled that the determination of an agency's procurement needs and the best method for accommodating them are matters primarily with the agency's discretion. *See XTRA Lease, Inc.*, 50 Fed.Cl. at 624. Plaintiffs do not dispute that such regionalization is common industry practice, and, in fact, conceded the point in their GAO protest. A.R. at 84. Rather, plaintiffs argue that "a regional structure is nei-

ther necessary nor appropriate in this setting because its use by MTMC is counterproductive." Pls.' Opp. at 34–35. Plaintiffs contend that the regional structure "is not rational or efficient." *Id.* at 35. Mere differences of opinion regarding the handling of a procurement matter are insufficient to support allegations of irrationality without supporting evidence. *See Day & Zimmermann Servs.*, 38 Fed.Cl. at 597 ("A court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members."). In this case, defendant adopted the regional structure for the solicitation based on: (1) its determination of the agency's needs; (2) its consultation with industry representatives; and (3) its examination of industry practices. Def.'s Mot. at 21–22; Def.'s Reply at 9. There is no disagreement between the parties that "it is a common industry practice for motor carriers to submit rates under a region-to-region concept." Def.'s Mot. at 22; *see* A.R. at 84. Defendant has assessed its needs and, consistent with the discretion afforded under the law, has selected a structure for this procurement to meet its needs. *See XTRA Lease, Inc.*, 50 Fed.Cl. at 624. The court cannot find here, and plaintiffs have not demonstrated, that the regional structure of the solicitation had no rational basis.